Argued May 21; reargued September 24; reversed October 22, 1940

AMERICAN FEDERATION OF LABOR ET AL. *v.* BAIN ET AL.

CONGRESS OF INDUSTRIAL ORGANIZATIONS ET AL. *v.* BAIN ET AL.

(106 P. (2d) 544)

B. A. *Green* and *Chris H. Boesen*, both of Portland (Joseph A. Padway, of Washington, D. C., and James Landye and R. K. Powell, both of Portland, on the brief), for American Federation of Labor.

*Gus J. Solomon*, of Portland (Lee Pressman, Joseph Kovner, and Anthony Wayne Smith, all of Washington, D. C., on the brief), for Congress of Industrial Organizations.

*Alfred A. Hampson*, of Portland, and *Willis S. Moore*, Assistant Attorney General (James R. Bain,

District Attorney, Frank S. Sever, and Clarence A. Potts, Deputy District Attorneys, R. R. Morris, I. H. Van Winkle, Attorney General, L. E. Latourette, City Attorney, and Alexander G. Brown, Deputy City Attorney, all of Portland, on the brief), for respondents.

*Osmond K. Fraenkel* and *Nathan Greene*, both of New York City, amici curiae for American Civil Liberties Union.

LUSK, J.

LUSK, J. The court is called upon in these cases to determine the constitutionality of a statute enacted by the voters at the general election held November 8, 1938, relating to labor disputes: Ch. 2, Oregon Laws, 1939. The proceedings are under the uniform declaratory judgment statute: Title II, Ch. XIV, Oregon Code 1930. One suit was filed by the American Federation of Labor, its officers and affiliated organizations; another by the Congress of Industrial Organizations, its officers and various affiliates. The Brotherhood of Locomotive Firemen and Enginemen and three other railroad unions, known as the "Railroad Brotherhoods", intervened in the suit filed by the American Federation of Labor and joined in the attack on the statute. The defendants are the district attorney and the sheriff of Multnomah county, the chief of police of the city of Portland, and the attorney general of the state of Oregon.

The cases were consolidated and heard by a court composed of three circuit judges sitting in banc, who filed an elaborate and carefully considered opinion sustaining the validity of the law, and entered decrees

dismissing the suits, from which these appeals are taken.

The law with its title reads:

## "AN ACT

"To protect the employee, the employer and the public in case of labor controversies; to define the term 'labor dispute'; to regulate collective bargaining agencies; to protect persons not direct parties to labor disputes from interference with their persons, property and civil rights; to protect the buying, selling, transporting, receiving, delivering, manufacturing, harvesting, processing, handling and marketing of agricultural and other products; to regulate and in certain cases forbid picketing and boycotting; to give to the courts jurisdiction for the enforcement of this act; to provide a penalty for the violation of this act, and to repeal all other acts in conflict with this act.

*"Be It Enacted by the People of the State of Oregon:*

"Section 1. Whenever in any statute or other law of this state the term 'labor dispute' is used, such term is hereby defined for all purposes to mean and include only an actual bona fide controversy in which the disputants stand in proximate relation of employer and the majority of his or its employees and which directly concerns matters directly pertaining to wages, hours, or working conditions of the employees of the particular employer directly involved in such controversy. Disputes between organizations or groups of employees as to which shall act for the employees in dealing with the employer shall not be classed as labor disputes, and the refusal of an employer to deal with either party to any such jurisdictional controversy shall not operate to make the dispute a labor dispute within the meaning of this act.

"Section 2. It shall be unlawful for any person, persons, association or organization to obstruct or prevent, or attempt to obstruct or prevent, the lawful buying, selling, transporting, receiving, delivering, manu-

facturing, harvesting, processing, handling, or marketing of any agricultural or other products.

"Section 3. It shall be unlawful for any person, persons, association or organization to picket or patrol, or post pickets or patrols, in or near the premises or property owned, occupied, controlled or used by an employer or employers unless there is an actual bona fide existing labor dispute between said employer or employers and his or their employees. It shall also be unlawful to boycott directly or indirectly any employer, or the business of such employer, not directly involved as a party in a labor dispute.

"Section 4. It shall be unlawful for any organization, association, or person, legally authorized to act as collective bargaining agent or representative of laboring people, to make any charge, or exaction for initiation fees, dues, fines or other exactions, which will create a fund in excess of the legitimate requirements of such organization, association, or person, in carrying out the lawful purpose of activities of such organization, association or person. Every such organization, association, and person shall keep accurate books itemizing all receipts and expenditures and the purpose of such expenditures. Any members of any labor organization or association shall be entitled at all reasonable times to inspect the books, records and accounts of such association, or organization, or any agent or representative thereof, and to have an accounting of all money and property thereof.

"Section 5. It shall be unlawful for any association, organization, or person by any direct or indirect means to prevent, hinder or molest any person from seeking to engage or engaging his services to any person, firm, corporation or association desiring to employ him.

"Section 6. *Civil Remedy*. The circuit courts of this state, and the judges thereof, shall have full power, authority and jurisdiction to enforce this act, including full power to issue restraining orders and temporary and permanent injunctions, and such other and further

orders as may be necessary or appropriate to carry out and enforce each and every provision of this act.

"Section 7. *Criminal Remedy.* Any person who shall violate any of the provisions of this act shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be punished accordingly.

"Section 8. All acts and part of acts in conflict with this act are hereby repealed."

All parties are agreed that the pleadings present a justiciable controversy, and, as we are of like mind with respect to all provisions of the law save Section 4, we shall proceed at once to a determination of the principal questions presented.

The plaintiffs invoke numerous provisions of both the federal and state constitutions with which the challenged statute is said to conflict. The argument at first took a wide range, but, in the end, the controversy has resolved itself largely into the question whether the regulation, or, as the plaintiffs would have it, the prohibition, of picketing and boycotting in Sections 1 and 3, invades the plaintiffs' fundamental rights and liberties of freedom of speech and of assemblage. It is agreed on all sides that these sections constitute the heart of the act, and that read together they mean that picketing and boycotting are declared unlawful in all cases save those in which an employer and a majority of his employees are engaged in an actual *bona fide* controversy which directly concerns matters pertaining to wages, hours or working conditions of such employees.

The First Amendment to the Constitution of the United States provides:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the

press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.''

Section 1 of the Fourteenth Amendment provides in part ''nor shall any state deprive any person of life, liberty, or property, without due process of law.''

■ By numerous decisions of the Supreme Court of the United States, some of which will be presently reviewed, it is established that the freedom of speech and of the press, secured by the First Amendment against abridgment by the United States, is similarly secured to all persons by the Fourteenth Amendment against abridgment by a state: *Schneider v. State,* 308 U. S. 147, 84 L. ed. 155, 60 S. Ct. 146, and cases cited in Note 8, 84 L. ed. 164.

The plaintiffs contend that decision here is controlled by *Thornhill v. Alabama,* 310 U. S. 88, 84 L. ed. 1093, 60 S. Ct. 736, and *Carlson v. California,* 310 U. S. 106, 84 L. ed. 1104, 60 S. Ct. 746, decided April 2, 1940, after the circuit court had rendered its decree in the cases at bar and shortly before they were first argued in this court. In the Thornhill case a statute of the state of Alabama prohibiting picketing was adjudged unconstitutional and void, and in the Carlson case a similar ordinance of Shasta county, California, met a like fate. Both enactments, it was held, were repugnant to the guarantee of freedom of speech in the federal constitution.

These cases may be said to be the culmination of a series of recent decisions by the Supreme Court in which the rights of individuals to be protected in freedom of speech, of the press and of assemblage, were vindicated as against state action found to impair those rights.

The first of these was *Lovell v. Griffin,* 303 U. S. 444, 82 L. ed. 949, 58 S. Ct. 666, decided March 28, 1938, in which the court held void a city ordinance which declared to be a nuisance the practice of distributing by hand or otherwise circulars, handbooks, advertising, or literature of any kind within the limits of the city without first obtaining written permission from the city manager. The ordinance was sought to be enforced against a person, who, without first securing a permit, had distributed in the city a pamphlet and magazine in the nature of religious tracts. The ordinance was held void on its face, the court saying: ''Whatever the motive which induced its adoption, its character is such that it strikes at the very foundation of the freedom of the press by subjecting it to license and censorship.''

The next of these decisions is *Hague v. Committee for Industrial Organization,* 307 U. S. 496, 83 L. ed. 1423, 59 S. Ct. 954, decided June 5, 1939, involving the validity of two ordinances of the city of Jersey City. One was similar to the ordinance passed upon in *Lovell v. Griffin,* supra, and was conceded to be void on the authority of that case. It need not be further noticed here. The other provided that ''no public parades or public assemblies in or upon the public streets, highways, public parks, or public buildings of Jersey City shall take place or be conducted until a permit shall be obtained from the director of public safety'', and the director of public safety was authorized ''to refuse to issue such permit when, after investigation of all the facts and circumstances pertinent to said application, he believes it to be proper to refuse the issuance thereof; provided, however, that said permit shall only be refused for the purpose

of preventing riots, disturbances, or disorderly assemblage.'' Certain individuals and unincorporated labor organizations filed a bill in equity in the United States District Court to enjoin enforcement of the ordinances. The Supreme Court sustained a decree of the district court enjoining the city officials from preventing the complainants from holding assemblies and meetings in the open air and at public places for the purpose of communicating their views respecting the National Labor Relations Act to the citizens of Jersey City. The ordinance was held to be void on its face. It was declared that the use of the streets and public places, ''for purposes of assembly, communicating thoughts between citizens, and discussing public questions has, from ancient times, been a part of the privileges, immunities, rights and liberties of citizens.'' It was further said that the ordinance ''enables the director of safety to refuse a permit on his mere opinion that such refusal will prevent 'riots, disturbances or disorderly assemblage'. It can thus, as the record discloses, be made the instrument of arbitrary suppression of free expression of views on national affairs for the prohibition of all speaking will undoubtedly 'prevent' such eventualities.''

On November 22, 1939, the Supreme Court handed down four opinions which are reported under the name of *Schneider v. State,* supra, each presenting the question whether regulations embodied in a municipal ordinance abridge the freedom of speech and of the press secured against state invasion by the Fourteenth Amendment of the Constitution. An ordinance of the city of Los Angeles, California, prohibited the distribution of handbills to or among pedestrians along or upon any street, sidewalk or park. An ordinance

of the city of Milwaukee made unlawful the distribution of circulars, handbills, etc., in or upon any sidewalk, street or other public place within the city. A similar ordinance of the city of Worcestor, Massachusetts, was before the court. An ordinance of the town of Irvington, New Jersey, prohibited anyone from canvassing, soliciting, or distributing circulars, or other matters or calling from house to house in the town of Irvington without first having reported to and received a written permit from the chief of police or the officer in charge of police headquarters. A person was convicted under the Los Angeles ordinance for distributing handbills to pedestrians on a public sidewalk. One who was acting as a picket was convicted of violation of the Milwaukee ordinance for standing in the street in front of a meat market and distributing to passing pedestrians handbills which pertained to a labor dispute with the meat market. Persons who distributed in the street leaflets announcing a protest meeting in connection with the administration of state unemployment insurance were convicted of the violation of the ordinance of the city of Worcestor. A member of the Watch Tower Bible and Tract Society was convicted of violating the ordinance of the town of Irvington. Without applying for or obtaining a permit pursuant to the ordinance, she called from house to house in the town and left books or booklets with the occupants of the houses visited pertaining to the religious creed which she professed.

All the convictions were set aside and all the ordinances declared void by the Supreme Court on the authority of *Lovell v. Griffin*, supra, and *Hague v. Congress for Industrial Organization*, supra. The court, in an opinion by Mr. Justice Roberts, announced

a criterion by which to judge the constitutionality of state legislation which is asserted to impair or abridge freedom of speech or of the press, more stringent than that which is applied when the challenge is to the alleged invasion of other rights and liberties embraced within the due process clause of the Fourteenth Amendment, and not specifically guaranteed by the First Amendment. As to the latter, the rule is that great weight must be given to the opinion of the lawmakers that the statute is a valid exercise of legislative power. *Carter v. Carter Coal Company*, 298 U. S. 238, 80 L. ed. 1160, 56 S. Ct. 855; *United States v. Carolene Products*, 304 U. S. 144, 82 L. ed. 1234, 58 S. Ct. 778; and "a regulatory statute is presumed to be supported by facts known to the legislature, unless facts judicially known or proved preclude that possibility." *South Carolina State Highway Department v. Barnwell Bros.*, 303 U. S. 177, 82 L. ed. 734, 58 S. Ct. 510. But speaking of freedom of speech and of the press, the court said:

"In every case, therefore, where legislative abridgement of the rights is asserted, the courts should be astute to examine the effect of the challenged legislation. Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions. And so, as cases arise, the delicate and difficult task falls upon the courts to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of the rights." (84 L. ed. 164.)

The court rejected the contention that the Los Angeles, Milwaukee and Worcestor ordinances should be sustained because their purpose was to prevent

littering the streets with handbills and other such materials, saying that this "is insufficient to justify an ordinance which prohibits a person rightfully on a public street from handing literature to one willing to receive it. Any burden imposed upon the city authorities in cleaning and caring for the streets as an indirect consequence of such distribution results from the constitutional protection of the freedom of speech and press." (84 L. ed. 165.) The argument that the Los Angeles and Worcestor ordinances were valid because their operation was limited to streets and alleys and left persons free to distribute printed matter in other public places was answered with the statement: "But, as we have said, the streets are natural and proper places for the dissemination of information and opinion; and one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." (84 L. ed. 165.)

The Irvington ordinance was condemned because "it bans unlicensed communication of any views or the advocacy of any cause from door to door, and permits canvassing only subject to the power of a police officer to determine, as a censor, what literature may be distributed from house to house and who may distribute it * * * In the end, his (the applicant's) liberty to communicate with the residents of the town at their homes depends upon the exercise of the officer's discretion." (84 L. ed. 166.)

After the decision of the Thornhill and Carlson cases, presently to be considered, the Supreme Court, on May 20, 1940, in the case of *Cantwell v. Connecticut*, 310 U. S. 296, 84 L. ed. 1213, 60 S. Ct. 900, 128 A. L. R. 1352, passed upon the constitutionality of a statute of the state of Connecticut which provides that no person

shall solicit money or subscriptions for any alleged religious, charitable, or philanthropic cause from other than a member of the organization for whose benefit such person is soliciting, or within the county in which such person or organization is located, unless such cause shall have been approved by the secretary of the public welfare council. That official is authorized by the statute to determine whether the cause is a religious one or is a *bona fide* object of charity or philanthropy and conforms to reasonable standards of efficiency and integrity, and, upon so finding, to issue a certificate to that effect. Violation of the statute is made punishable by fine and imprisonment. Newton Cantwell and his two sons were arrested in New Haven, Connecticut, and convicted of violating the statute, and also of committing the common law offense of inciting a breach of the peace. The Cantwells were members of a group known as Jehovah's Witnesses, and claimed to be ordained ministers. Their alleged offense consisted of requesting of two pedestrians on a public street permission to play them a phonograph record, and, permission being granted, playing the record which embodied an attack on organized religion in general and the Catholic Church in particular, it then being their intention to solicit of their auditors subscriptions toward the publication of certain pamphlets on religious subjects. The incident occurred in a thickly populated neighborhood, where 90 per cent of the residents are Roman Catholics.

The court held that the authority given the secretary of the public welfare council to withhold his approval, if he determines that the cause is not a religious one, constitutes a censorship of religion, and that the statute, as applied, deprived the Cantwells of their liberty without due process of law in contravention of

the Fourteenth Amendment. Freedom of religion, guaranteed as against hostile action of the United States by the First Amendment, was said to be one of the liberties protected by the Fourteenth Amendment as against invasion by the states. Conceding that the purpose of the statute was to safeguard against the perpetration of frauds under the cloak of religion, the court held that the means used were not legitimate because the regulation involved a religious test. And, because the evidence failed to disclose any conduct on the part of the Cantwells which could be reasonably said to invite a breach of the peace and the judgment was based "on a common law concept of the most general and undefined nature", the situation being "analogous to a conviction under a statute sweeping in a great variety of conduct under a general and indefinite characterization, and leaving to the executive and judicial branches too wide a discretion in its application", the conviction of the common law offense of inciting a breach of the peace was set aside. The opinion concludes as follows:

"Although the contents of the record not unnaturally aroused animosity, we think that, in the absence of a statute narrowly drawn to define and punish specific conduct as constituting a clear and present danger to a substantial interest of the State, the petitioner's communication, considered in the light of the constitutional guarantees, raised no such clear and present menace to public peace and order as to render him liable to conviction of the common law offense in question."

In *Thornhill v. Alabama,* supra, the defendant was convicted of violation of a statute of Alabama reading as follows:

"Any person or persons, who, without a just or legal excuse therefor, go near to or loiter about the

premises or place of business of any other person, firm, corporation, or association of people, engaged in a lawful business, for the purpose, or with the intent of influencing, or inducing other persons not to trade with, buy from, sell to, have business dealings with, or be employed by such persons, firm, corporation, or association, or who picket the works or place of business of such other persons, firms, corporations, or associations of persons, for the purpose of hindering, delaying, or interfering with or injuring any lawful business or enterprise of another, shall be guilty of a misdemeanor; but nothing herein shall prevent any person from soliciting trade or business for a competitive business.''

Thornhill was one of several striking employees picketing the plant of his employer. He was arrested when, in a peaceful manner, he attempted to persuade another man from reporting for work at the plant.

In *Carlson v. California,* supra, Carlson was convicted of violation of an ordinance of Shasta county, California, which, among other things, made it:

''Unlawful for any person, in or upon any public street, highway, sidewalk, alley or other public place in the County of Shasta, State of California, to loiter in front of, or in the vicinity of, or to picket in front of, or in the vicinity of, or to carry, show or display any banner, transparency, badge or sign in front of, or in the vicinity of, any works, or factory, or any place of business or employment, for the purpose of inducing or influencing, or attempting to induce or influence, any person to refrain from entering any such works, or factory, or place of business, or employment, or for the purpose of inducing or influencing, or attempting to induce or influence, any person to refrain from purchasing or using any goods, wares, merchandise, or other articles, manufactured, made or kept for sale therein, or for the purpose of inducing or influencing, or attempting to induce or influence, any person to refrain from doing or performing any

service or labor in any works, factory, place of business or employment    *    *    *''

At the time of his arrest, Carlson, with others, was patrolling a highway near a construction job, carrying a sign which bore the legend, ''This job is unfair to C.I.O.'' There was no obstruction to traffic, and Carlson was peaceful and orderly in his demeanor.

The Supreme Court reversed the judgments of conviction in both cases, and held the enactments unconstitutional and void on their face as abridgments of freedom of speech.

■ By the decisions in the Thornhill and Carlson cases it is now established that picketing as an incident to a labor dispute is, at least in some of its phases, an exercise of the right of freedom of speech. The court said in the Thornhill case:

''In the circumstances of our times the dissemination of information concerning the fact of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution. Hague v. C.I.O., 307 U. S. 496; Schneider v. State, 308 U. S. 147, 155, 162-63. See Senn v. Tile Layers Union, 301 U. S. 468, 478. It is recognized now that satisfactory hours and wages and working conditions in industry and a bargaining position which makes these possible have an importance which is not less than the interests of those in the business or industry directly concerned. The health of the present generation and of those as yet unborn may depend on these matters, and the practices in a single factory may have economic repercussions upon a whole region and affect widespread systems of marketing. The merest glance at State and Federal legislation on the subject demonstrates the force of the argument that labor relations are not matters of mere local or private concern. Free discussion concerning the conditions in industry and the causes of labor disputes appears to us indispensable to

the effective and intelligent use of the processes of popular government to shape the destiny of modern industrial society. The issues raised by regulations, such as are challenged here, infringing upon the right of employees effectively to inform the public of the facts of a labor dispute are part of this larger problem. We concur in the observation of Mr. Justice Brandeis, speaking for the Court in Senn's case (301 U. S. at 478): 'Members of a union might, without special statutory authorization by a State, make known the facts of a labor dispute, for freedom of speech is guaranteed by the Federal Constitution.' ''

In the Carlson case the court said:

''For the reasons set forth in our opinion in Thornhill v. Alabama, *supra*, publicizing the facts of a labor dispute in a peaceful way through appropriate means, whether by pamphlet, by word of mouth, or by banner, must now be regarded as within that liberty of communication which is secured to every person by the Fourteenth Amendment against abridgment by a state.''

The court tested the statutes on their face. In the Thornhill case it was said:

''Where regulations of the liberty of free discussion are concerned, there are special reasons for observing the rule that it is the statute, and not the accusation or the evidence under it, which prescribes the limits of permissible conduct and warns against transgression.''

Analyzing the forms of conduct proscribed, it was found to be ''apparent that one or the other of the offenses comprehends every practicable method whereby the facts of a labor dispute may be publicised in the vicinity of the place of business of an employer.''

''The range of activities'', it was said, ''proscribed by Section 3448, whether characterized as picketing or

loitering or otherwise, embraces nearly every practicable, effective means whereby those interested—including the employees directly affected—may enlighten the public on the nature and causes of a labor dispute.''

And, it was held, citing the opinion of Mr. Justice Holmes in *Schenck v. United States,* 249 U. S. 47, 63 L. ed. 470, 39 S. Ct. 247:

''Abridgment of the liberty of such discussion can be justified only where the clear danger of substantive evils arises under circumstances affording no opportunity to test the merits of ideas by competition for acceptance in the market of public opinion.''

The proponents of the statutes insisted that they were enacted in the exercise of the reserved powers of the states to pass laws for the promotion of the public peace, safety and general welfare; to prevent the occasions of disorder, violence and the destruction of property, and unwarranted interference with legitimate business. These contentions were answered by the court in the Thornhill case. It was said:

''We hold that the danger of injury to an industrial concern is neither so serious nor so imminent as to justify the sweeping proscription of freedom of discussion embodied''.

And, further:

''But no clear and present danger of destruction of life or property, or invasion of the right or privacy, or breach of the peace can be thought to be inherent in the activities of every person who approaches the premises of an employer and publicises the facts of a labor dispute involving the latter.''

The plea that the abridgment should be sustained because picketing was prohibited only ''in or near the

premises of the employer" is disposed of by the statement quoted from the Schneider and Hague cases:

"(The) streets are natural and proper places for the dissemination of information and opinion; and one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."

The court made it clear that the vice of the statute lay in the sweep of its provisions. It referred in the Thornhill case to "the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion", since it "does not aim specifically at evils within the allowable area of State control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press." Again, in discussing the claim that the purpose of the statute to protect the community from breaches of the peace and violence vindicated it against the charge of unconstitutionality, it was said:

"We are not now concerned with picketing en masse or otherwise conducted which might occasion such imminent and aggravated danger to these interests as to justify a statute narrowly drawn to cover the precise situation giving rise to the danger. Compare American Foundries v. Tri-City Council, 257 U. S. 184, 205. Section 3448 in question here does not aim specifically at serious encroachments on these interests and does not evidence any such care in balancing these interests against the interest of the community and that of the individual in freedom of discussion on matters of public concern."

■ We have thus, at more than ordinary length, reviewed these decisions, because the plaintiffs are here claiming that fundamental rights, secured to them by

the Constitution of the United States, are invaded by the challenged statute. In the field of federal constitutional law the Supreme Court of the United States is the final arbiter. Its decisions as to the meaning of the provisions of the Constitution bind us all—state judges, under their oaths of office, no less than others. Our own personal, individual views as to the soundness of such decisions are immaterial. Unless, therefore, some real, not fanciful, basis of distinction exists between the prohibitions of the Alabama statute and the California ordinance declared repugnant to constitutional guarantees in these cases, and the like restrictions on the conduct of individuals contained in the statute here under consideration, this court has no other alternative than to declare the statute unconstitutional.

The Supreme Court has, in the cited cases, announced a broad construction of the guarantees of freedom of speech and the press, and, applying this conception to laws aimed at picketing, has held that publicizing the facts of a labor dispute in a peaceful way through appropriate means, whether by pamphlet, by word of mouth or by banner, is within the liberty of communication which is secured to every person by the Fourteenth Amendment against abridgment by a state. It has held, further, that the exercise of this right may not be abridged by proscribing it at the scene of a labor dispute. It has declared the streets of a city appropriate places for the dissemination of views on matters of public moment, and that labor controversies come within that category.

No claim is made by the proponents of the present statute that in defining the term, ''labor dispute'', it was intended to declare that an actual labor dispute could not lawfully exist unless the majority of em-

ployees of a particular employer were participants. Such a construction would result in imputing to the people a purpose to ignore actualities. Counsel for the defendants agree with the view of the court below that the definition of a labor dispute in the statute is "merely a draftsman's device for shortening the phraseology of the act", by describing the class of cases to which the prohibition on picketing does not apply. In this construction we concur. Thus, there remains a wide field of labor controversies in which picketing is declared to be unlawful. Hence, there is no room for a contention—and none has been made— that the Thornhill and Carlson cases are not controlling, because the Supreme Court limited its decisions to the right to publicize the facts of a labor dispute. The prohibitions of the statute under review clearly include picketing in *bona fide* labor controversies.

■ In the statute there is no definition of the word "picket". It is a word of "vague contours", as the Supreme Court said in the Thornhill case, and doubtless may be used to indicate conduct of a noxious character with which the state has power to deal. But it also embraces activities which the Supreme Court holds the state may not lawfully suppress. It includes, we think, the conduct of one who walks or patrols in the vicinity of a place of business involved in a labor dispute, and by word of mouth, banner or placard, undertakes to give information to the public concerning such dispute. The conduct of such person may be peaceful or otherwise; his demeanor orderly or threatening; the information true or false. The activity may be, and usually is, incident to an organized effort to prevail in the controversy and we concur in the view of counsel for the defendants that it was precisely picket-

ing by a member of a labor union on behalf of his organization that the voters had in mind when they enacted this law. But that the activities embraced by the word "picket" were intended to include such as are free from violence, intimidation and fraud,—what is ordinarily called "peaceable picketing"— we think there can be no doubt. It follows that the very type of conduct which the Supreme Court held in the Thornhill and Carlson cases to be protected by the Fourteenth Amendment, is denounced by the Oregon statute unless engaged in incident to a controversy relative to wages, hours or working conditions, between an employer and a majority of his employees. Otherwise stated, such conduct on the part of a minority of employees, who may have such a controversy with their employer, is prohibited.

The only question that remains, therefore, is whether the statute is taken out of the rule of the Thornhill and Carlson cases because it does not prohibit all picketing, but only picketing engaged in by a minority of the employees of a particular employer as incident to a labor dispute as defined in the statute. Because of this limitation, it is said, the Oregon statute is a law of regulation for the benefit of the public, while the Alabama statute and the California ordinance were laws of prohibition for the benefit of narrower interests.

■ In considering constitutional questions the courts look through forms to the substance of things. It is not important, therefore, whether we call the statute one of prohibition or of regulation. That it prohibits to the minority the exercise of rights conceded to the majority there can be no question. If there are 500 employees in a plant whose employer is paying inadequate wages, either in fact or in the opinion of 249,

the 249 who alone choose to make an issue of the matter may not, under this statute, exercise what the Supreme Court has held to be their constitutional right of freedom of speech, because the 251 prefer to avoid a dispute with their employer.

In a stipulation of facts entered into by the parties, and made a part of the record, it is stated:

"Usually the employees of Oregon employers engaged in a craft or trade comprise less than a majority of all the employees of their respective employers."

If the members of such a minority craft union have a controversy with their employer over wages, hours, or working conditions they are prohibited from picketing notwithstanding that they may have grievances peculiar to their own work and employment and with which the remainder of the employees are in no way concerned.

■ The law's implied recognition of the right of the majority to picket when engaged in a controversy with their employer relating to wages, hours or working conditions, is also a recognition that picketing, peacefully conducted in those circumstances, does not give rise to "the clear danger of substantive evils", which alone may justify abridgment of the right. On what theory, then, can the abridgment of the right of the minority be supported? There is not inherently a difference in picketing, either with respect to the manner in which it is carried on, or the consequences to those who may be affected by it, based on the number of employees who may be disputing with their employer. On the contrary, whether engaged in on behalf of a few or many, picketing may be peaceful or otherwise, for a lawful or unlawful purpose, by a single individual or en masse, and fraught with either negligible or

serious consequences to the employer and the public. See *People v. Gidaly*, 35 Cal. App. (2d) 758, 93 P. (2d) 660. Besides the invalid classification which the court found in the cited case in a similar law, the fundamental defect of the statute, in the light of the Supreme Court's decisions is, that it is not aimed at specific evils which the state without doubt has power to correct; but the prohibition, to the extent that it applies, is as broad as that condemned in the Thornhill and Carlson cases, and, like the enactments there considered, "sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press."

The fundamental constitutional right which the Supreme Court sustained in the cited cases was declared to be secured to "every person". We see no escape from the conclusion that the denial of such a right to the members of a minority is no less an unconstitutional abridgment of the right simply because it is saved to the majority.

Counsel for defendants have with consummate ability argued that the law should be sustained as an exercise of the state's reserved powers. They take the view that the restrictions of the challenged statute are justified by its public purpose to prevent interference with business transactions and the free flow of commerce. The circuit court thought that these restrictions found their warrant in their tendency to minimize breaches of the peace and violence at the scene of labor controversies. As already observed, similar considerations were pressed upon the Supreme Court and rejected in the Thornhill and Carlson cases. It is sufficient to say that if, as the Supreme Court holds, no such clear and present danger to the interests of

the public arises in every case of peaceful picketing as to justify a statute prohibiting picketing altogether, it is difficult to understand how the existence of such danger can be assumed in every instance where picketing, peaceful though it may be, is carried on by a minority of employees engaged in a labor dispute with their employer.

It is insisted, though not by the defendants, that this statute should be sustained as a valid exercise of the reserved power of the state to legislate for the public peace and welfare because it is a necessary and appropriate means of preventing disorders such as have characterized many labor controversies here in recent years. It is even asserted that the statute, since its enactment, has accomplished that purpose and had that effect. The opprobrious acts referred to are these: That men engaged in mass picketing accompanied by violence and breaches of the peace; that farmers were openly prevented from transporting upon the highways of this state their own products to the market; that streets in Portland were closed to traffic by mass picketing; that property owners were prevented from obtaining access to their own property; that thugs were employed to dynamite and destroy buildings, to commit assaults and other acts of violence.

Most, if not all, of the acts in this catalogue of misdeeds were, at the time of the enactment of the statute, and still are, condemned by the criminal laws of this state. It needed no law prohibiting picketing to punish and prevent violence, breaches of the peace, assault and battery, arson, malicious destruction of property, trespass, and the closing of public streets by private individuals. If we are to go into the matter whether the statute has had the effect claimed for it—

a dangerous field of inquiry where constitutional questions are at issue—it is recent history, known to all, and of which this court takes judicial knowledge, its own records being a part of that history, that an aroused public opinion and vigorous enforcement of the criminal law, resulting in the prosecution and punishment of scores of labor malefactors, had at least something to do with the cessation of these evils.

■ Many of the unlawful acts thus invoked as affording a constitutional basis for the challenged statute had no connection with picketing and could have been perpetrated just as well had there been no picketing. Many others occurred in the course of labor controversies in which, under this statute, picketing would have been approved as lawful,—controversies in which a majority of employees were in a dispute with their employers over wages, hours, or working conditions. Such, for example, was the longshoremen's strike of 1934, when men, picketing en masse, took possession of the water front of the city of Portland, closed certain streets to the public, and deprived property owners of access to their own property. There can be no pretense that this statute would have prohibited picketing in that controversy.

The argument which we are discussing concedes that peaceful picketing is a lawful means for the dissemination of information, and, as such, is protected by the Federal Constitution. It has not been disputed by any party to this case, either plaintiffs or defendants; in fact, it is expressly conceded, that the prohibitions of the challenged statute extend to peaceful picketing. The argument, therefore, comes to this—that a man may be deprived of a fundamental constitutional right because other men in the past have abused the

right, committed unlawful acts, and worked injury to the state and may do so again.

It has now been determined by the highest court in the land, as we read its decisions, that a law of this kind, so broad and sweeping in its provisions, cannot stand as against the guaranty of freedom of speech in the Federal Constitution. But the Supreme Court has not decided, and we are far from implying by our decision, that proper regulatory measures may not be taken by the state to curb evils arising from the activities of labor unions, as of every other group. No right is held absolutely—not even the right to speak freely.

Mr. Justice Holmes said in *Schenck v. United States,* 249 U. S. 47, 52:

"The most stringent protection of free speech would not protect a man in falsely shouting fire in a theater, and causing a panic. It does not even protect a man from an injunction against uttering words that may have all the effect of force. Gompers v. Buck's Stove & Range Co., 221 U. S. 418, etc."

This court recently declared in *Wallace v. International Association,* 155 Or. 652, 664, 63 P. (2d) 1090:

"When the purpose of picketing is to injure or destroy a business rather than to further the common interests of the worker, it is an unlawful interference with the property rights of the employer and should be enjoined".

The Supreme Court in the Thornhill case was careful to point out that the statute then held void "leaves room for no exceptions based upon either the number of persons engaged in the proscribed activity, the peaceful character of their demeanor, the nature of their dispute with an employer, or the restrained char-

Or. 165—Sig. 8

acter and accurateness of the terminology used in notifying the public of the facts of the dispute.'' The court reaffirmed the power of the state to set the limits of permissible contest to industrial combatants; and indicated that ''a statute narrowly drawn to cover the precise situation giving rise to the danger'' would present a totally different question from that then before the court.

Inasmuch, however, as the prohibitions upon picketing in Sections 1 and 3 of the statute now under consideration are such as to come within the condemnation of that character of legislation by the Supreme Court of the United States, we are compelled to declare those provisions void as in contravention of the Fourteenth Amendment of the Federal Constitution.

For that reason we see no good to come from discussion of language used by the court in earlier decisions in labor cases, nor of the Sherman Act and National Labor Relations Act cases, which counsel contend are at variance with what is decided in the Thornhill and Carlson cases. If such inconsistencies of decision exist, it will be for the Supreme Court itself to reconcile or otherwise dispose of them. It is not permissible for us to ignore or to attempt to explain away the binding force of the court's most recent declarations upon the very subject with which we are here concerned.

■ Our decision relative to the prohibition against picketing in Sections 1 and 3 requires that these sections be held void in their entirety since all their provisions are interdependent. So much is conceded by counsel for defendants.

■ We will notice briefly the other sections of the act.

Section 2 provides:

"It shall be unlawful for any person, persons, association or organization to obstruct or prevent, or attempt to obstruct or prevent, the lawful buying, selling, transporting, receiving, delivering, manufacturing, harvesting, processing, handling, or marketing of any agricultural or other products."

Section 5 provides:

"It shall be unlawful for any association, organization, or person by any direct or indirect means to prevent, hinder or molest any person from seeking to engage or engaging his services to any person, firm, corporation or association desiring to employ him."

In the debate over Sections 1 and 3, the foregoing provisions have been all but forgotten, and little has been said in the briefs or oral arguments upon the question of their interpretation. Whatever other activities their prohibitions were intended to embrace, we think it manifest that picketing, in some of its forms, is included among them. It is the very purpose of some picketing to prevent the delivery and manufacturing of products and to prevent persons from engaging their services to others.

That being so, we are of the opinion that the rule is applicable here, that "where the enforcement of portions of a statute after the elimination of unconstitutional sections would produce results not contemplated or desired by the legislature, the entire statute is usually held to be inoperative and void." 6 R. C. L. Constitutional Law, 124, § 122. Sections 2 and 5 must, therefore, fall with Sections 1 and 3.

Section 4 makes it unlawful for any organization or person, legally authorized to act as collective bargaining agent or representative of laboring people,

to make any charge for initiation fees, dues, fines or other exactions, which will create a fund in excess of the legitimate requirements of such organization or persons for carrying out their lawful purposes. It requires the keeping of accurate books of account by labor unions, and gives the right of inspection and accounting to their members.

This section is clearly separable from those which we have heretofore considered. But, as we view it, nothing in the record justifies our entering upon the consideration of the constitutionality of its provisions. No facts are presented by the pleadings, or otherwise, disclosing a justiciable controversy under the declaratory judgment statute. The only facts alleged in the amended complaint are:

"That substantially all of said labor unions above referred to and represented by these plaintiffs collect fees, dues, fines and other exactions for the purpose of creating funds to take care of sick and destitute members, to provide funeral benefits, strike benefits, funds for organizational purposes, for educational, political, social and other purposes; that said defendants are contending that all such dues, fines, fees and other exactions, for such purposes aforesaid, are not for 'legitimate requirements' of such organizations, and are threatening to prosecute and will, unless restrained by this Court, institute criminal proceedings against said labor unions and their officers, agents and members, because of the collection of said fees, dues and other exactions, as being in violation of the provisions of Section 4 of said alleged Act".

The defendants answer the foregoing allegations by saying:

"They have no knowledge or information sufficient to form a belief as to the purposes for which funds are collected by said labor unions, the right of said

labor unions to collect funds, or the right of the representatives of said unions to dispose of the same, and therefore deny that they are contending that the funds so collected by said labor unions are collected or disbursed otherwise than in accordance with the legitimate requirements thereof.''

The only evidence on the subject is contained in the stipulation of facts, and is as follows:

''On November 8, 1938, and prior thereto, the people of the state of Oregon had reasonable cause to believe that some representatives or members of certain of the unions affiliated with the plaintiff organizations had used funds of their union to purchase or acquire guns, saps, stink bombs and crystals, explosives and other like weapons or materials, for use in connection with certain labor disputes, and that some members or representatives of some such organizations had used funds of the organization to compensate members and non-members of the organization for assaults and injuries upon persons whose actions were deemed inimical to the accomplishment of their purposes, and for the destruction of property of some such person. It is not stipulated by any party to these proceedings that any such union funds so used, if they were in fact so used, were used with the authority, approval or knowledge of the organization owning the funds.''

In this state of the record, and particularly in view of the indefinite nature of some of the provisions of the section we think it will be time enough to determine the question of its constitutionality when someone is accused of violating it. Mere difference of opinion as to the constitutionality of an act does not afford ground for invoking a judicial declaration having the effect of an adjudication. *Oregon Creamery Manufacturers Association v. White*, 159 Or. 99, 111, 78 P. (2d) 572.

■ Section 6, providing civil remedies, Section 7, providing for punishment for violation of the act, and Section 8, a repealing provision, must fall with the other sections declared void; except that in the event that Section 4 is ultimately adjudged constitutional, these sections will stand insofar as they are applicable to the provisions of Section 4.

■ The amended complaint prays for an injunction restraining the defendant officials from enforcing the Act. It is a well-established rule that equity will not enjoin criminal proceedings or stay the hands of the peace officers in enforcing criminal law, except where the law attempted to be enforced is unconstitutional and void and its enforcement will result in an irreparable injury to vested property rights. 28 Am. Jur., Injunctions, 414, § 233. Proceedings under the declaratory judgment statute are not excepted from this rule: Anderson, Declaratory Judgments, 300, § 114; and, as the pleadings here disclose no threatened injury to any property rights of the plaintiffs, they are not entitled to injunctive relief.

The decree of the circuit court is reversed and one entered here conformable to the foregoing opinion. No costs or disbursements will be allowed.

KELLY, BELT and BAILEY, JJ., concur.

BEAN, J., not sitting.

--------

ROSSMAN, J. (specially concurring). The courts of this state have never held that a picket who carries a banner or engages in speech is protected by the Constitutional guarantee of freedom of speech and of the press. Since the street upon which he paces to and fro is owned by the public, and since its use is sub-

ject to municipal and state regulation, the picket's rights have never been deemed by the Oregon courts free from legislative control. Ordinarily, a right subject to such limitations is not deemed within the purview of the first section of the Bill of Rights. Hence, the activities of a picket have never been spoken of by the courts of this state as the exercise of the Constitutional right of freedom of speech.

Only within the last three years has the Federal Supreme Court declared that the act of making known the facts of a labor dispute is the exercise of the Constitutional right of freedom of speech, and it was not until six months ago that it said that a picket's use of a printed banner is protected by the Constitutional guarantee of freedom of speech. Two years ago the nation celebrated the sesquicentennial of its Constitution. In the century and a half that passed since the Constitution was written the Supreme Court never recognized picketing as the exercise of freedom of speech, although in that period of time it determined many controversies in which pickets were involved. As recently as 1905 a federal court said:

"There is, and can be, no such thing as peaceful picketing, any more than there can be chaste vulgarity, or peaceful mobbing, or lawful lynching." *Aitchison Railway Co. v. Gee*, 139 Fed. 582.

In 1919 the same attitude towards picketing was voiced in California (*Moore v. Cooks' etc. Union*, 39 Cal. App. 538, 179 P. 417). In that same 150 years Congress never recognized picketing as freedom of speech. Had picketing been deemed the exercise of a Constitutional right, the Clayton Act, the Wagner Act, the Norris-LaGuardia Act, and similar enactments would have been wholly unnecessary.

It is significant that in the two articles printed in the Voters' Pamphlet, in opposition to the picketing bill, at the time of its submission to the people (November 8, 1938), no mention was made of freedom of speech. One of those opposition articles was written by the Oregon State Federation of Labor.

The above is not written in disapproval of the new interpretation, but to make it clear that the recognition of picketing as the exercise of the Constitutional right of freedom of speech is not only recent, but also in sharp contrast with all that was done and said in the first 150 years of the Republic's development of its Constitutional law. It is not inappropriate to add that the new point of view has been subjected to criticism as unsound. See September, 1940, edition of the American Bar Association Journal, page 709.

It may be well to pause for a moment and consider the nature of the Constitutional right of freedom of speech. If picketing is deemed the exercise of that Constitutional privilege, we may have to revise our conception of that right; for otherwise we shall possibly subject some employers, who refuse to yield to picketers' demands, to conditions which may be ruinous. Freedom of speech grants greater rights than the privilege of placing in front of an establishment a couple of pickets with modest placards in their hands. Freedom of speech as developed in a century and a half of American Constitutional law is by no means a vain thing. To the contrary, it is intended to be a means of getting things done, and, in order to give to it effectiveness, the law subjects numerous other rights to its superior potency. Recognition of the right of freedom of speech has in the past been confined almost exclusively to the field of governmental problems,

and, in order that those problems may be solved without resort to arms, the law gives to freedom of speech the great potency just mentioned; thus making it one of the Brahmans of the law.

Mr. Justice Brandeis, in *Whitney v. California*, 274 U. S. 357, gave to us the conception of freedom of speech which has found the most favor. He said:

"* * * To justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced. There must be reasonable ground to believe that the danger apprehended is imminent. There must be reasonable ground to believe that the evil to be prevented is a serious one. * * * To courageous, self-reliant men, with confidence in the power of free and fearless reasoning applied through the processes of popular government, no danger flowing from speech can be deemed clear and present, unless the incidence of the evil apprehended is so imminent that it may befall before there is opportunity for full discussion. If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence. Only an emergency can justify repression. Such must be the rule if authority is to be reconciled with freedom. * * * The fact that speech is likely to result in some violence or in destruction of property is not enough to justify its suppression. There must be the probability of serious injury to the State."

In *Thornhill v. Alabama*, 60 Sup. Ct. 736, 84 L. Ed. 659, in which it was held directly that the promulgating of information by means of a picket is protected by the guarantee of freedom of speech, the court endorsed the views of which notice has just been taken, twice saying that before suppression can be resorted to, the danger threatened by speech must be not only imminent, but also of a "serious" character. Mind you,

the danger must be to the State—the employer's peril is immaterial.

It is worthy of repetition that in a democracy freedom of speech is essential. And it is essential that a wide range of latitude be given to the speaker. In no other way can democratic institutions survive. When sound principles of government are the issue in a democracy, argument, debate, heated controversy, ill-considered threats, and even some violence, must be expected and must be tolerated. Generally, they occur in some public meeting place and, hence, no one individual is injured more than the others. But, when incidents of that kind occur at the entryway of some business establishment which has declined to meet the pickets' demands, the situation may be disastrous for the employer.

In the past at least, wages were said to be the result of the operation of the law of supply and demand. Today we resort to collective bargaining. Free speech, if resorted to at the entryway of an employer's place of business, seems more compatible with popular referendum than with a determination of wage scales under the economic principle just mentioned. In *Senn v. Tile Layers Union*, 301 U. S. 468, in which the court for the first time mentioned freedom of speech while disposing of a cause involving a labor dispute, it likened the allowable union activity to the "advertisements" which a merchant employs. Advertisements, circulars and window displays are a restricted form of publicity. When employed for purely commercial purposes, they possibly are not protected by the First Amendment. Be that as it may, the use of that form of publicity is compatible with collective bargaining as the basis of a wage scale.

The purpose of the above is not to express my views concerning the new interpretation of a picketer's rights. Whether the new interpretation has opened a Pandora's Box from which vexatious troubles of a new and novel character will escape, or whether it is, in truth, a reopening from which hope, after its long confinement, has at last been released, are problems upon which I am not called upon to express an opinion. The above review of the nature of freedom of speech is offered to justify a statement that state judges—they not being the authors of the new interpretation of a picketer's privileges—ought to apply the new rights cautiously. The rights are new and powerful. That circumstance suggests that we ought to be sure that we understand the new interpretation before we expand it. It may be that the employer-employee relationship, which has gained for itself a special classification in our jurisprudence, will receive the benefit of the First Amendment only in a modified or restricted form. Possibly something of that kind is what Mr. Justice Brandeis had in mind when in the Senn case he likened labor's appeal for public preference to a merchant's efforts, through advertising, to find a market for his goods. It will be recalled that he spoke of "advertisements in the press, * * * circulars, * * * window displays." In the Thornhill and the Carlson cases Mr. Justice Murphy more than once spoke of "the publicizing of the facts of a labor dispute"—a phrase not substantially different from Mr. Justice Brandeis'. In none of the three cases just mentioned did the court, as it was using those words, associate them with the clamor, violence and disturbances sometimes attendant upon the exercise of free speech. To the contrary, all three decisions so many times described as peaceful the

activities of the pickets involved in those cases that they implied a different result would have been required had the attendant circumstances been otherwise. Further, the approval in the Thornhill decision of *American Foundries v. Tri-City Council,* 257 U. S. 184, strongly suggests that a picketer is not to be allowed the full benefit of freedom of speech. The opinion of the majority, it seems to me, goes beyond the new decisions —not in its result, but in its statement of the controlling principles.

Not every picket is engaged in the exercise of freedom of speech or of the press. He may be merely a lookout or engaged in patrol duty only. To be within the Constitutional protection, it is essential that he give forth information; or, in the words of the Supreme Court, "publicize the facts of a labor dispute."

The new decisions of the Federal Supreme Court, which held that the act of a picket who proclaims the facts of a labor dispute is within the protection of the First Amendment as extended by the Fourteenth, leave no room for any conclusion except that our statute is invalid.

Subject to the above limitations, I concur in the opinion of the majority.

---

RAND, C. J. (dissenting). In passing upon the constitutionality of this Act, consideration should first be given to the objects and purposes of the Act and the reasons which impelled the people of this state to enact its provisions into law. Prior to its enactment and growing out of the rivalry which existed between the two great divisions of labor—the American Federation of Labor on the one hand and the Congress of

Industrial Organizations on the other—over jurisdictional questions as to the members of which of said organizations should be permitted to work, and like controversies between certain unions affiliated with the American Federation of Labor, picketing, accompanied by violence and breaches of the peace, became prevalent in many parts of the state and resulted in so much lawlessness and violence as to threaten the very peace and safety of the state. As a result thereof, the plants and premises of many employers, who had no interest in such controversies and had taken no part in them, were subjected to mass picketing and, because of violence and breaches of the peace resulting therefrom, many workers were thrown out of employment, and business and industry throughout the state became disorganized and disrupted to the great detriment not only of the employers and workers but also of the people of the state as a whole. To mention but a few of such instances, farmers were openly prevented from transporting, upon the public highways of the state, their own farm products to market, and certain streets in the city of Portland were closed to traffic by large bodies of men engaged in mass picketing. Property owners were prevented from obtaining access to their own property. Shipping was brought to a complete standstill in the Portland harbor. Thugs were employed to break windows, destroy trucks and automobiles, dynamite and destroy buildings, and men anxious to work were beaten and severely injured, and their homes and families were threatened and sometimes subjected to violence.

That such conditions did exist and that the unions themselves were unable to prevent such occurrences

are admitted in one of the plaintiffs' replies filed in the court below, wherein it is stated:

"Plaintiffs further admit that in the past, on occasions, certain individual members of labor unions in Oregon, in disregard of their obligations to their organizations, their fellow members and the people of the state of Oregon, have committed wrongful, unlawful and criminal acts."

Clearly, it was within the power of the state to prevent such disorders, and this law was enacted for that purpose by the people of this state at the regular general election of November 8, 1938, by a vote of 197,771 for to 148,460 against. That it had the effect of curing such evils, is proved by the fact that, since its enactment, the acts of lawlessness above referred to have almost if not entirely ceased to exist in this state. Hence, in approving this law, the people did not consider that they were enacting an unnecessary and non-useful act. They believed, and had reason to believe, that its enactment was necessary for the public welfare and, that being its purpose, courts are not at liberty to substitute their views of what is just and expedient.

The Tenth amendment to the Constitution of the United States provides that the powers not delegated to the United States by the Constitution nor prohibited by it to the states are reserved to the states respectively or to the people. The power to preserve the public peace within the states, in the exercise of the police power, has not been delegated to the United States by the Constitution nor is it prohibited by the Constitution to the states. Hence, this law is constitutional and valid so far as these plaintiffs are concerned unless it unnecessarily and unreasonably deprives them of

some right or privilege guaranteed to them by the federal or state constitution.

It is undisputed that peaceful picketing is a lawful means for the dissemination of information and, as such, is protected by the Federal Constitution which guarantees to all persons the freedom of speech and of the press and the right of peaceable assembly. These fundamental personal rights cannot, however, be exercised in utter disregard of the rights and safety of the public. While they cannot be prohibited absolutely or be unduly or arbitrarily restricted, they are subject to such reasonable restrictions by the states as are necessary to secure the public peace and welfare. The right of free speech would not justify a stranger to enter another person's home without his consent in order to give expression to his views nor authorize an intruder, for the same purpose, to interrupt a church service. There are limitations, therefore, which the state may rightfully impose upon the exercise of such rights, both as to the place in which they may be exercised and as to the manner and method of their exercise, the only limitation being that the restriction shall be reasonable and not arbitrary and be necessary for the public welfare and safety.

As I read the cases of *Thornhill v. State of Alabama*, 310 U. S. 88, 84 L. ed. 1093, 60 S. Ct. 736, and *Carlson v. California*, 310 U. S. 106, 84 L. ed. 1104, 60 S. Ct. 746, and also the four leaflet cases, referred to in the majority opinion, all of which absolutely prohibit either picketing or what was held to be the exercise of the right of free speech, nothing is there said which is contrary to the views above expressed. If the Act in question here absolutely prohibits all picketing, whether peaceful or otherwise, this Act is, of course,

unconstitutional, but as I read the Act it does not have that effect. It was intended to limit the exercise of the right to places where picketing could be carried on without detriment to the public welfare, and, in defining such places, the Act makes no reference whatever to any public street, park or other public place.

Plaintiffs' principal objection to this Act is based on sections 1 and 3 thereof, which read as follows:

"Section 1. Whenever in any statute or other law of this state the term 'labor dispute' is used, such term is hereby defined for all purposes to mean and include only an actual bona fide controversy in which the disputants stand in proximate relation of employer and the majority of his or its employees and which directly concerns matters directly pertaining to wages, hours or working conditions of the employees of the particular employer directly involved in such controversy. Disputes between organizations or groups of employees as to which shall act for the employees in dealing with the employer shall not be classed as labor disputes, and the refusal of an employer to deal with either party to any such jurisdictional controversy shall not operate to make the dispute a labor dispute within the meaning of this act."

"Section 3. It shall be unlawful for any person, persons, association, or organization, to picket or patrol, or post pickets or patrols, in or near the premises or property owned, occupied, controlled or used by an employer or employers unless there is an actual bona fide existing labor dispute between said employer or employers and his or their employees. It shall also be unlawful to boycott directly or indirectly any employer, or the business of such employer, not directly involved as a party in a labor dispute."

In construing these two sections, the trial judges said:

"We first consider the definition of 'labor dispute' and the purpose of defining it. It is sheer fallacy to argue that there can be no lawful labor dispute except

as defined in the statute, or that 'all other labor disputes for all purposes are outlawed', or that Section 1 intended to make 'malevolent' every labor dispute not permitted by the definition contained in that section. Obviously the definition of a labor dispute is merely a draftsman's device for shortening the phraseology of the Act. There is nothing in these sections which makes any type of controversy between employer and employee illegal, but certain affirmative conduct remains permissible in one type of controversy which is forbidden in all others. That type of controversy is defined as a labor dispute. If the type of controversy described as a labor dispute exists then, so far as this statute is concerned, the employees may picket near the premises of the employer. If it does not exist, they may not. The statute would have an identical meaning if the phrase 'labor dispute' were never employed. Combined, the two sections would read, and should be read,

" 'It shall be unlawful for any person * * * to picket * * * in or near the premises * * * owned by an employer * * * unless there is an actual bona fide controversy in which the disputants stand in proximate relation of employer and the majority of his or its employees and which directly concerns matters directly pertaining to wages, hours or working conditions of the employees of the particular employer directly involved in such controversy * * *;'".

The term "labor dispute", as used in this statute, is a term adopted by the statute for the purpose of defining the conditions, on the one hand, under which picketing and boycotting will be permitted and, on the other hand, the conditions under which they will be prohibited. The Act thus limits the right to picket in or near the premises or property of the employer to a majority of his or its employees and denies that right to a less number or to any other person or persons whomsoever. It does not, however, deny to the minor-

ity or to labor generally the right to organize, to engage in collective bargaining, to call strikes or to engage in any activity of labor which might otherwise be permitted to take place in the absence of this statute.

Nor does the act in any manner or to any extent limit or restrict the right of a minority to picket at any place or places except "in or near the premises" of the employer. While the expression "in or near the premises" is somewhat vague and indefinite, it evidently means on the premises themselves or so close to the premises that persons going to and returning from work would be compelled to pass through picket lines. In all other places, the minority is not prohibited by this act from forming picket lines.

It is contended that this statute is unconstitutional because it limits the right of picketing "in or near the premises" of an employer to a majority of the employees of a particular employer and denies that right to a minority of such employees. It is a matter of common knowledge that union men refuse to pass through picket lines. If, in a case where a majority of the workmen are satisfied with their wages, hours and working conditions and two or three or any less number than a majority of the employees are permitted to picket the premises or the property of their employer, it would result in depriving the majority of the right to work. Moreover, in such case, the picketing and patrolling by a minority would almost inevitably lead to violence and breach of the peace. Hence, this provision is reasonable and not arbitrary. But, for a much stronger reason, this limitation upon the right of the minority is a valid exercise of the police power.

As stated, union men refuse to pass through picket lines and, where workers are compelled, in going to

and returning from work, to pass through picket lines, it results in violence and breach of the peace. For that reason, it was within the legislative power of the state to prohibit the forming of picket lines so close to the premises of the employer that the workmen would be compelled to pass through such lines in going to and returning from their work and, since the state, in order to insure the public safety and welfare, may prohibit the forming of picket lines at a place or places where the forming of such lines would lead to violence and breach of the peace, it may, under its police power, prohibit the forming of picket lines at any such place or places, although it cannot absolutely prohibit picketing on a public street or in a park or other public place. This power of the state is recognized in *Thornhill v. Alabama*, supra, where the court said:

"* * * The power and the duty of the State to take adequate steps to preserve the peace, and to protect the privacy, the lives, and the property of its residents cannot be doubted."

From this it follows that since the state may prohibit the formation of picket lines at a place or places where violence and breach of the peace would result therefrom it may permit picketing at such a place by a majority and deny it to a minority without making the statute unconstitutional and without denying to the minority any constitutional right, upon the theory that there would be less liability to violence and breach of the peace where the picketing was done by the majority rather than by the minority. Whether, like other legislative Acts, the making of this distinction was wise was a legislative question, with the wisdom of which the courts are not concerned.

For the reasons stated, I am compelled to dissent.