## Ex Parte R. J. Thomas.

No. 8160. Decided October 27, 1943.
Rehearing overruled November 24, 1943.
(174 S. W., 2d Series, 958.)

*W. R. Smith, Jr.,* of Austin, *Mandell & Wright,* of Houston, *Maurice Sugar* and *Ernest Goodman,* both of Detroit, Mich., and *Less Pressman,* of Washington, D. C., for relator.

The law under which the restraining order was issued is unconstitutional because it deprives relator of the right of free speech, it is class legislation, discriminatory and deprives petitioner of the equal protection of the laws guaranteed by Article 1, section 19 and Article 3, section 56 of the Texas Constitution and the 14th amendment to the Constitution of the United States. It is also violative of Article 1, section 8 of the Constitution of· the United States in that it imposes an additional burden on interstate commerce. Ex parte Siebold, 100 U. S. 371, 25 L. Ed.

717; Ex parte Allison, 90 S. W. 870; Ex parte Warfield, 50 S. W. 933.

*Gerald C. Mann,* Attorney General, *Jesse Owens,* and *Fagan Dickson,* Assistants Attorney General, for the State.

The law in question is valid and infringed in no way on relator's constitutional rights. The district court had jurisdiction of the subject matter and there was no fundamental error apparent on the face of the record, in which this order was issued. Relator had a remedy by appeal, and his application of writ of habeas corpus could not be used as a substitute for an appeal. Ex parte Duncan, 127 Texas 407, 95 S. W. (2d) 675; Harbison v. McMurray, 138 Texas 192, 158 S. W. (2d) 284; Ex parte Lipscomb, 111 Texas 409, 239 S. W. 1101.

*National Lawyers Guild by Bernard A. Golding,* of Houston, filed brief as amicus curiae.

MR. CHIEF JUSTICE ALEXANDER delivered the opinion of the Court.

This is an original habeas corpus proceeding filed in this Court by relator, R. J. Thomas, to obtain his release from a judgment in contempt imposed by a trial court. The action involves the validity of Section 5 of House Bill No. 100, Acts 1943, 48th Legislature, Chapter 104, page 180 (Vernon's Annotated Texas Statutes, Art. 5154a), which Act prescribes certain regulations applicable to labor unions.

The provisions of the Act pertinent to the action here under consideration are as follows:

"Section 1. Because of the activities of labor unions affecting the economic conditions of the country and the State, entering as they do into practically every business and industrial enterprise, it is the sence of the Legislature that such organizations affect the public interest and are charged with a public use. The working man, unionist or non-unionist, must be protected. The right to work is the right to live.

"It is here now declared to be the policy of the State, in the exercise of its sovereign constitutional police power, to regulate the activities and affairs of labor unions, their officers, agents, organizers, and other representatives, in the manner, and to the extent hereafter set forth.

"Sec. .. * * * (c) 'labor organizer' shall mean any person who for a pecuniary or financial consideration solicits memberships in a labor union or members for a labor union."

"Sec. 5. All labor union organizers operating in the State of Texas shall be required to file with the Secretary of State, before soliciting any members for his organization, a written request by United States mail, or shall apply in person for an organizer's card, stating (a) his name in full; (b) his labor union affiliations, if any; (c) describing his credentials and attaching thereto a copy thereof, which application shall be signed by him. Upon such applications being filed, the Secretary of State shall issue to the applicant a card on which shall appear the following: (1) the applicant's name; (2) his union affiliation; (3) a space for his personal signature; (4) a designation, 'labor organizer'; and, (5) the signature of the Secretary of State, dated and attested by his seal of office. Such organizer shall at all times, when soliciting members, carry such card, and shall exhibit the same when requested to do so by a person being so solicited for membership."

"Sec. 11. If any labor union violates any provision of this Act, it shall be penalized civilly in a sum not exceeding One Thousand Dollars ($1,000) for each such violation, the sum recovered as a penalty in a Court of competent jurisdiction, in the name of the State, acting through an enforcement officer herein authorized. Any officer of a labor union and any labor organizer who violates any provision of this Act shall be deemed guilty of a misdemeanor, and upon conviction thereof in a Court of competent jurisdiction, shall be punished by a fine not to exceed Five Hundred Dollars ($500) or by confinement in the county jail not to exceed sixty (60) days, or by both such fine and imprisonment."

. "Sec. 12. The District Courts of this State and the Judge thereof shall have full power, authority and jurisdiction, upon the application of the State of Texas, acting through an enforcement officer herein authorized, to issue any and all proper restraining orders, temporary or permanent injunctions, and any other and further writs. or processes appropriate to carry out and enforce the provisions of this Act. Such proceedings shall be instituted, prosecuted, tried and heard as other civil proceedings of like nature in said Courts."

"Sec. 14. The provisions of this Act are to be liberally construed so as to effecutate the purposes expressed in the preamble

and in such manner as to protect the rights of laboring men to work and/or to organize for their mutual benefit in connection with their work; nor shall anything in this Act be construed to deny the free rights of assembling, bargaining, and petitioning, orally or in writing with respect to all matters affecting labor and employment."

"Sec. 15. If any Section or part whatsoever of this Act shall be held to be invalid, as in contravention of the Constitution, such invalidity shall not affect the remaining portions thereof, it being the express intention of the Legislature to enact such Act without respect to such Section or part so held to be invalid."

The State filed suit in the trial court, alleging that the relator was a labor organizer within the meaning of the Act, who for pecuniary or financial consideration was engaged in soliciting members for a certain labor union; that he had not previously applied to nor obtained from the Secretary of State an organizer's card, as provided for in Section 5 of the Act; and that he was threatening to and would violate the provision of said Section 5 of the above Act by soliciting members for said labor union in Texas, unless he was restrained from so doing. The trial court issued a temporary restraining order and caused notice thereof to be served on the relator. Thereafter the relator, who was a paid representative of the union, violated the terms of the injunction by soliciting members for said union without having first registered with the Secretary of State as provided for in said Section 5. After a hearing he was adjudged to be in contempt of court and his punishment fixed at a fine of $100.00 and confinement in jail for three days.

There is no question as to the sufficiency of the pleadings or the regularity of the proceedings in the contempt action, nor is there any contention that the facts were in sufficient to show a violation of Section 5 of the Act. Relator's counsel in his argument before this Court conceded the existence of the necessary factual basis for the judgment in the contempt proceedings. His only contention is that said Section 5 of the Act violates the provisions of Article I, Section 8, of the State Constitution, which prohibits the enactment of any law abridging or curtailing the right of freedom of speech, and Article XIV, Section 1, of the Federal Constitution, which prohibits a state from enacting any law abridging the privileges and immunities of a citizen of the United States or depriving any person of his liberty.

The right of the State under its inherent police power to regulate labor unions in order to protect the public welfare ap-

pears to be almost beyond question. In recent years, and particularly during the war, the necessity for and the power of labor unions and the effect of their operation upon the general public welfare have been fully demonstrated., As said in the preamble to the Act here under consideration, labor unions enter into practically every business and industrial enterprise, and greatly affect the economic condition of the country. Under our present social system millions of employees bargain for and secure their rights, such as wages, hours of labor, and other working conditions, through labor organizations. In addition, large sums of money are contributed in the form of dues by the employees for the support of the unions. The manner in which these unions function for the protection of their members greatly affects the economic life of the individual worker. The large membership in a single union, and the limited opportunity of the individual member to personally familiarize himself with the manner in which his union is operated make it impossible for the individual worker to protect himself in his own right against its mismanagement. These circumstances present a field for legislation by the State for the protection of the rights of the laborer as well as the general public.

■ The government under its police power always has the right to enact any and all legislation that may be reasonably necessary for the protection of the health, safety, comfort, and welfare of the public. 9 T. J. 503; Halsell v. Ferguson, 109 Texas 144, 202 S. W. 317, 321; Bradford v. State, 78 Texas Cr. Rep. 285, 180 S. W. 702; Wylie v. Hayes, 114 Texas 46, 263 S. W. 563.

Legislation by the National Congress regulating the relationship between labor unions and employers by the National Labor Relations Act of 1935 (U. S. C. A., Sec. 151 et seq.), commonly called the Wagner Act, was sustained under the commerce clause of the Federal Constitution. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U. S. 1, 81 L. Ed. 893, 57 S. Ct. 615, 108 A. L. R. 1352. Similar Acts by State Legislatures have been sustained under the police power of the State. Fenske Bros. v. Upholsterers International Union, 358 Ill. 239, 193 N. E. 112; 97 A. L. R. 1318; Wisconsin Labor Relation Board v. Fred Rueping Leather Co., 228 Wis. 473, 179 N. W. 673; 117 A. L. R. 398; Allen-Bradley Local No. 1111 v. Wisconsin Employment Relation Board, 237 Wis. 164, 295 N. W. 791; Fansteel Metallurgical Corp. v. Lodges 66, 295 Ill. App. 323, 14 N. E. (2d) 991; Davega City Radio, Inc. v. State Labor Relations Board, 281 N. Y. 13, 22 N. E. (2d) 145.

The power to regulate and supervise has been extended to unincorporated associations and societies, such as Ku Klux Klan. The People of the State of New York v. Charles F. Zimmerman, 241 N. Y. 405, 150 N. E. 497, 43 A. L. R. 909, affirmed 278 U. S. 63, 73 L. Ed. 184, 49 S. Ct. 61, 62 A. L. R. 785.

The fact that the Federal Government has legislated on the subject under the commerce clause does not exclude the right of the State to legislate on the same subject under its police power. Wisconsin Labor Relation Board v. Fred Rueping Leather Co., 228 Wis. 473, 279 N. W. 673, 117 A. L. R. 398.

We are therefore convinced that the regulation of labor unions is a proper subject for legislation under the police power by this State. It was for the Legislature, and not the courts, to say whether such legislation was necessary or was best for the interest of the people of this State.

We are brought then to a consideration of whether Section 5 of the Act here under consideration constitutes an abridgment or curtailment of the right of free speech or the deprivation of a person of his liberty, as guaranteed by the Constitution.

A careful reading of the section of the law here under consideration will disclose that it does not interfere with the right of the individual lay members of unions to solicit others to join their organization. It does not affect them at all. It applies only to those organizers who for a pecuniary or financial consideration solicit such membership. It affects only the right of one to engage in the business as a paid organizer, and not the mere right of an individual to express his views on the merits of the union. Furthermore, it will be noted that the Act does not require a paid organizer to secure a license, but merely requires him to register and identify himself and the union for which he proposes to operate before being permitted to solicit members for such union. The Act confers no unbridled discretion on the Secretary of State to grant or withhold a registration card at his will, but makes it his mandatory duty to accept the registration and issue the card to all who come within the provisions of the Act upon their good-faith compliance therewith.

That the Legislature was justified in concluding that that part of the Act here under consideration was necessary for the protection of the general welfare of the public, and particularly the laboring class, can hardly be doubted. As previously stated,

membership in labor unions runs into millions. Not infrequently thousands of employees work at a single plant. It is impossible for them to know each other, or to know those who purport to represent the various unions. When a laborer is approached by an alleged organizer it is impossible for him to know whether he is an imposter or whether he has authority to represent the union which he purports to represent. Thus a great field for the perpetration of fraud both as against the laborer and the union is presented. It is important to the laborer that he be able to know that the representations of the purported organizer who approaches him with a request that he join the union and pay his dues in order to be able to work on a particular job are the representations of an accredited agent of the union and that the promises of such representative will be respected and carried out by the union; and it is equally important to the union that the purported representative be identified in order that pretenders under the guise of authority from the union may not misrepresent the organization, nor collect and squander funds intended for its use. The law is for the protection of both the laborer and the union.

Nothing is better established than the power of the Legislature to enact legislation for the purpose of preventing "fraud and deceit, cheating and imposition." 16 C. J. S. 555; Standard Stock Food Co. v. Wright, 225 U. S. 540, 32 Sup. Ct. 784, 56 L. Ed. 1197.

The regulation does not appear to be an unreasonable one. It is true that the Act interferes to a certain extent with the right of the organizer to speak as the paid representative of the union, but such interferences are not necessarily prohibited by the Constitution. The State under its police power may enact laws which interfere indirectly and to limit extent with the right of speech or the liberty of the people where they are reasonably necessary for the protection of the general public. 12 C. J. 952. See also 9 T. J. 503; Cox v. New Hampshire, 312 U. S. 569, 85 L. Ed. 1049, 61 Sup. Ct. 762, 133 A. L. R. 1396.

In the case of Carpenters & Joiners Union v. Ritter's Cafe, 315 U. S. 722, 725, 726, 62 Sup. Ct. 807, 86 L. Ed. 1143, it is said:

"Where, as here, claims on behalf of free speech are met with claims on behalf of the authority of the State to impose reasonable regulations for the protection of the community as a whole, the duty of this Court is plain. Whenever state action is challenged as a denial of 'liberty,' the question always is whether

the state has violated 'the essential attributes of that liberty.' Mr. Chief Justice Hughes in Near v. Minnesota, 283 U. S. 697, 708. While the right of free speech is embodied in the liberty safeguarded by the Due Process Clause, that Clause postulates the authority of the states to translate into law local policies 'to promote the health, safety, morals and general welfare of its people, * * * the limits of this sovereign power must always be determined with appropriate regard to the particular subject of its exercise.' Ibid., at 707."

Many statutes have been enacted in this State which curtail or limit the right of one to operate or speak as the agent of another. For example: "The Securities Act" (Art. 600a, Vernon's Civil Statutes) prohibits an agent from selling securities for another without a permit from the Secretary of State. Insurance agents are required to secure licenses before being permitted to sell insurance. Art. 5062a, Vernon's Civil Statutes. Railway agents are required to have a certificate of authority before being permitted to sell railway tickets. Art. 5416, Rev. Civ. Stat. 1925. A real estate broker is required to have a license before he may act as the agent for another. Art. 6573a, Vernon's Civil Statutes. Likewise, Congress has enacted a statute which requires agents of foreign goverenments to register with the Secretary of State before being permitted to so act. 22 U. S. C. A., Sec. 601. Numerous other illustrations could be given. None of these statutes have been held unconstitutional on the ground that they abridged the right of free speech or otherwise unnecessarily deprived a person of his liberty.

In our opinion, the Act imposes no previous general restraint upon the right of free speech. It does not impose a general restraint on the right to solicit others to join the union, nor does it vest unlimited discretionary power in the Secretary of State to grant or refuse a registration card to any one qualified under the Act to solicit members for the unions. It merely requires paid organizers to register with the Secretary of State before beginning to operate as such.

In the case of Cantwell v. Connecticut, 310 U. S. 296, 84 L. Ed. 1213, 60 Sup. Ct. 900, 128 A. L. R. 1352, the Supreme Court condemned the right to impose censorship upon the right of religious worship or free speech by vesting in some officer discretionary power to issue or to refuse to issue permits for the sale and distribution of literature, but in that connection said:

"The general regulation, in the public interest, of solicitation, which does not involve any religious test and does not unreason-

ably obstruct or delay the collection of funds, is not open to any constitutional objection, even though the collection be for a religious purpose. Such regulation would not constitute a prohibited previous restraint on the free exercise of religion or interpose an inadmissible obstacle to its exercise."

The requirement of an organizer's card for paid labor organizers who solicit in Texas is nothing more than a "general regulation, in the public interest, of solicitation, which does not involve any religious test and does not unreasonably obstruct or delay the collection of funds." See also the case of Cox v. New Hampshire, 312 U. S. 569, 85 L. Ed. 1049, 61 Sup. Ct. 762, 133 A. L. R. 1396, wherein the Supreme Court sustained a statute which required the obtaining of a license as a condition precedent to the right to parade in a city.

In the case of City of Manchester v. Leiby, 117 Fed. (2d) 661 (certiorari denied), 313 U. S. 562, 61 S. Ct. 838, 85 L. Ed. 1522, the court had under consideration the validity of an ordinance of the City of Manchester which required an applicant to register before being permitted to sell literature on the streets. In discussing the question the court there said:

"The challenged ordinance is modest in scope. It puts no restriction upon the giving away of books, papers, magazines, etc., at any time and at any place. Persons desiring to 'sell or expose for sale' such literature on the streets or other public places are required to identify themselves before a designated official who keeps a record of the name and age of the applicant. For a nominal deposit a badge is issued to the applicant, who must wear the same conspicuously while selling on the streets, so that citizens and police may readily see that the seller has complied with the ordinance. It is provided that this deposit is to be returned upon surrender of the badge. As we read the ordinance the superintendent of schools has no function to pass on the character of the literature which the applicant proposes to expose for sale; nor has he any discretion to grant or withhold the license. On the contrary, it is his simple duty to issue the badge upon receipt of the application 'properly executed.' Aside from the regulations applicable to children under fourteen, all that the ordinance does is to enable the city to keep track of persons selling literature on the streets."

\* \* \* \* \*

"By contrast the Manchester ordinance now before us contains no element of prior censorship upon the distribution of literature. It requires only a simple routine act of obtaining a badge of identification before a person can sell on the streets.

This reasonable police regulation, in our opinion, imposes no substantial burden upon the freedom of the press or the free exercise of religion."

The case of Lovell v. City of Griffin, 303 U. S. 444, 58 Sup. Ct. 666, 82 L. Ed. 949, relied on by relator, is not in point. The ordinance there under consideration vested in the city manager the discretionary power to grant or refuse a permit to distribute literature of any kind at any time and in any manner, and thereby effectively impose a censorship on the right to distribute such literature. The same is true of the cases of Hague v. Committee for Industrial Organization, 307 U. S. 496, 515, 516, 83 L. Ed. 1423, 1436, 1437, 59 Sup. Ct. 954; Schneider v. Irvington, 308 U. S. 147, 160, 84 L. Ed. 155, 164, 60 Sup. Ct. 146; Cantwell v. Connecticut, 310 U. S. 296, 306, 307, 84 L. Ed. 1213, 1219, 1220, 60 S. Ct. 900, 128 A. L. R. 1352. For an analysis of the opinions in those cases see Cox v. New Hampshire, 312 U. S. 569, 85 L. Ed. 1049, 61 Sup. Ct. 762, 133 A. L. R. 1396.

We are of the opinion that the part of the Act in question is valid, and that the trial court acted within its authority in adjudging the relator guilty of contempt. Relator's petition for discharge will be denied, and he will be remanded to the custody of the Sheriff of Travis County, in order that the judgment of the district court may be enforced.

Opinion delivered October 27, 1943.

Rehearing overruled November 24, 1943.