STAPLETON et al. v. MITCHELL, Atty. Gen., et al.

McELROY et al. v. SAME.

AMERICAN FEDERATION OF LABOR et al. v. SAME.

CONGRESS OF INDUSTRIAL ORGANIZA-TIONS et al. v. SAME.

Nos. 4821, 4822, 4826, 4827.

District Court, D. Kansas, First Division.

March 5, 1945.

---

**53**

Louis R. Gates, of Kansas City, Kan., for United Mine Workers.

Clif Langsdale, of Kansas City, Mo., and P. W. Croker, of Kansas City, Kan., for Building and Construction Trades Council of Kansas City.

Joseph A. Padway, Gen. Counsel, A. F. of L., of Washington, D. C., and James H. Barnes, of Kansas City, Kan., for American Federation of Labor.

Lee Pressman, Gen. Counsel, C.I.O., and Eugene Cotton, Asst. Council, C.I.O., both of Washington, D. C., and Harry C. Clark, of Kansas City, Mo., for C.I.O. and C.I.O. Affiliated Unions.

James H. Barnes, of Kansas City, Kan., and Harry C. Clark, of Kansas City, Mo., for Four Transportation Brotherhoods and I.T.U.

A. B. Mitchell, Atty. Gen., of Kansas, Allen Meyers, Co. Atty., Shawnee County, of Topeka, Kan., Samuel M. Terbovich, Co. Atty., Wyandotte County, of Kansas City, Kan., and Clayton Brenner, Co. Atty., Johnson County, of Olathe, Kan., for defendant.

Before HUXMAN and MURRAH, Circuit Judges, and RICE, District Judge.

MURRAH, Circuit Judge.

Each of these suits was brought by a national and international labor union and all of its integrated entities and affiliates, officers, agents and representatives, acting in both their individual and representative capacities, and certain non-affiliated individuals in their individual and representative capacities. The parties jointly and severally challenge the constitutionality of the 1943 Kansas Labor Law, Session Laws of 1943, c. 191, and seek a judgment enjoining the operation and enforcement of the Act, as applied to them individually and collectively, on the grounds that its very existence as a law imposes a previous restraint upon the exercise of the fundamental rights to free speech, press and assembly, guaranteed by the First Amendment, and protected against state abridgement by the due process clause of the Fourteenth; that the operation and enforcement of the law will deprive them, and each of them, of the equal protection of the law, impose involuntary servitude, and is in collision with the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., in the field of industrial relations affecting interstate commerce, and therefore cannot stand with it.

The pleadings are studiously designed and the issues framed to effectively present the constitutional cause of everyone connected with, or engaged in self-organization for collective bargaining purposes, from the international and national union to the smallest union, and from the highest official of the international organization to the lowest worker, as well as non-members of a union, who are seeking to organize for collective bargaining purposes.

Federal jurisdiction is laid in the allegations that the suit arises under the Constitution and laws of the United States, and that the value of the right involved exceeds $3,000, and upon the further and firmer ground that it is brought to redress the deprivation of the rights of free speech, press and assembly under color of state statute. Original jurisdiction is conferred by the Civil Rights Act, 8 U.S.C.A. § 43, and this suit is clearly within the adjudicatory power of the Federal courts without consideration of the question of diversity of citizenship or the amount in controversy. Hague v. C. I. O., 307 U.S. 496, 514, 59 S.Ct. 954, 83 L.Ed. 1423; Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324. Because each petition prays for an interlocutory injunction, in addition to the prayer for an adjudication of unconstitutionality and permanent injunctive relief, the suits are cognizable by a three-judge court under Section 266 of the Judicial Code, 28 U.S.C.A. § 380, and in pursuance of the mandate of that statute this court was convened to hear and decide the issues presented. See Phillips v. United States, 312 U.S. 246, 61 S.Ct. 480, 85 L.Ed. 800; Query v. United States, 316 U.S. 486, 62

S.Ct. 1122, 86 L.Ed. 1616. The sole basis for the three-judge jurisdiction is the prayer for the interlocutory relief, but its jurisdiction once properly invoked is co-extensive and co-ordinate with the jurisdiction of a single judge in the trial of the controversy committed to it by the statute. Thus all the formal jurisdictional elements are present and it becomes the duty of the court to hear and decide the controversy.

But, notwithstanding the authority of the court to hear and dispose of the cases, it is our duty to heed the repeated admonitions concerning the appropriate exercise of the jurisdiction thus conferred. Much confusion has arisen from the adjudicated cases bearing upon the appropriate exercise of Federal jurisdiction to enjoin the enforcement of state statutes as violative of the Fourteenth Amendment to the Constitution. See Penal Statutes by Declaratory Action, 52 Yale Journal, June 1943, by Edwin Borchard. In cases challenging the constitutionality of a state regulatory act as violative of the due process and equal protection clauses of the Fourteenth Amendment, it is said that this court is not warranted in interfering with the declared public policy of a state by injunctive process, unless it patently appears that each and every clause, sentence and paragraph in whatever manner and against whomever it may be made applicable, contravenes the Federal Constitution and that the operation of the statute will cause great and immediate loss to the complainant. Watson v. Buck, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416; Spielman Motor Sales Co. v. Dodge, 295 U.S. 89, 55 S.Ct. 678, 79 L.Ed. 1322; Beal v. Missouri Pacific R. R. Corporation, 312 U.S. 45, 61 S.Ct. 418, 85 L.Ed. 577; Douglas v. City of Jeannette, supra. And, we are not at liberty to nullify the act simply because some state official may make an unconstitutional application of it. Adequate redress for this type of grievance is provided elsewhere when it arises.

It is noteworthy, however, that the "doctrine of abstention" (Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971) was evolved in cases where property rights under the Fourteenth Amendment and not personal rights under the First were the subject of adjudication. Apparently the courts now make a distinction in the appropriate exercise of Federal jurisdiction where only the due process and equal protection clause of the Fourteenth Amendment are involved, and those cases where the legislation is challenged because it collides with the fundamental principles of the First. "Much of the vagueness of the due process clause disappears when the specific provisions of the First become its standard." West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 1186, 87 L.Ed. 1628. The right of a state to regulate property rights as far as the due process clause is concerned includes the power to impose all the restrictions "which a legislature may have a 'rational basis' for adopting." West Virginia State Board of Education v. Barnette, supra. But, as Justice Jackson said in that case, freedom of speech, press and assembly "may not be infringed on such slender grounds. They are susceptible of restriction only to prevent grave and immediate danger to interests which the state may lawfully protect. It is important to note that while it is the Fourteenth Amendment which bears directly upon the State, it is the more specific limiting principles of the First Amendment that finally govern this case." Schneider v. State, 308 U.S. 147, 161, 60 S.Ct. 146, 84 L.Ed. 155. Cf. Connolly v. Union Sewer Pipe Co., 184 U.S. 540, 558, 22 S.Ct. 431, 46 L.Ed. 679; Barbier v. Connolly, 113 U.S. 27, 5 S.Ct. 357, 28 L.Ed. 923.

In other words the distinction is between a "rational basis" in the property-right cases arising under the Fourteenth Amendment alone and the "clear and present danger" cases in which the Fourteenth Amendment is an instrument for transmitting human liberties guaranteed by the First. For example, the court had no difficulty in sustaining the three-judge court's jurisdiction to strike down the flag-salute statute in the Barnette case, or the three-judge jurisdiction to invalidate a Louisiana statute which had for its purpose, as the court held, the licensing of the press by the imposition of a gross receipts tax for the privilege of engaging in the newspaper business. Grosjean v. American Press, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660. In Douglas v. City of Jeanette, supra, the Supreme Court sustained federal jurisdiction, but withheld the injunctive hand of the court because there was no finding of immediately threatened irreparable injury in the circumstances, and because a decision of the Supreme Court

that day in another case (Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292, 146 A.L.R. 82) gave the petitioners all the relief they sought in the three-judge court. See also Hague v. C. I. O., supra, 307 U.S. at pages 501, 502, 59 S.Ct. 954, 83 L.Ed. 1423.

In sum, it seems fairly plain that although the state courts are the preferable forum for the adjudication of the question whether a state statute offends against the Federal Constitution on the theory that state courts equally with the Federal courts are charged with the duty of safeguarding constitutional rights, and since they are the sole judge of the meaning and import of a state statute they should be the first judge of whether state law transcends rights protected by the Federal Constitution. But, where as here, fundamental human liberties are drawn in issue, the Federal courts are a proper forum for the determination of the question whether a state statute trespasses upon an area which the Federal Constitution has set apart as hallowed grounds for expression of democratic ideas. We yet like to believe that wherever the Federal courts sit, human rights under the Federal Constitution are always a proper subject for adjudication, and that we have not the right to decline the exercise of that jurisdiction simply because the rights asserted may be adjudicated in some other forum.

With these precepts in mind it is competent for us to judge the quality and estate of the rights asserted, and to determine for ourselves whether they are abridged by the declared public policy of Kansas, as embodied in the legislation drawn in issue. The legislation is entitled "An Act relating to employers and employees, organizations of employees, and officers and agents of such organizations, and providing penalties for violations thereof." It became effective on May 1, 1943, and has not been enforced against any of the complainants, only because of the sufferance of the Attorney General during the pendency of these proceedings.

Section 1 of the Act defines "Labor organization" as any organization of employees having within its membership residents of the State of Kansas organized for the purpose of dealing with employers concerning hours of employment, rate of pay, working conditions or greivances of any kind relating to the employer. The term "business agent" is defined as any person, without regard to title, who shall act or attempt to act for any labor organization (a) in the issuance of membership or authorization cards, work permits, or any other evidence of rights granted or claimed in or by a labor organization, or (b) in soliciting or receiving from any employer any right or privilege for employees when such labor organization has not been certified or recognized as the bargaining unit for such employees. Section 2 guarantees the right of self-organization and collective bargaining through chosen representatives, and the right to refrain from such activities. Section 3 provides that no person shall operate in Kansas as a business agent, without first having obtained a license from the Secretary of State by making application therefor and the payment of $1 as a "fee". The application must state the name and residence of applicant, and must be accompanied by the signed statement of the president and secretary of the organization for whom the applicant will act, showing his authority to do so. The "license" is issued for the calendar year, unless sooner surrendered, suspended, or revoked.

Section 4 requires every labor organization desiring to operate within the state to file a copy of its constitution and by-laws with the Secretary of State, provided that no secret ritual relating solely to initiation and reception of members shall be required. Section 5 requires every labor organization operating in the State of Kansas and having twenty-five or more members to make annual reports to the Secretary of State, showing the condition of such organization at the close of business of each calendar year. It is required to give the name of the labor organization, location of its office, name of its president, secretary, treasurer, and business agent, together with the post office address and the remuneration paid each; the date of the regular election of officers, the rate of its initiation fees, and any other charges against its members, and a verified statement of the income, expenditures, assets and liabilities of the organization. Upon the filing of such report, the labor organization is required to pay the Secretary of State an annual fee of $2. Section 6 provides that these reports become public property in the custody of the Secretary of State. Section 7 makes it unlawful for any employer to interfere with, restrain, or coerce employees in the exercise of the right of self-organization

and collective bargaining guaranteed by Section 2 of the Act, provided that no provision of the Act shall be construed to deprive the employer of his constitutional right to free speech as guaranteed by the State and Federal Constitutions.

Section 8, inter alia, makes it unlawful for any person (1) to interfere with, or prevent the right of franchise of any member of any labor organization, including the right to make complaint, file charges, give information, etc., concerning violations of the Act, or of his right of free petition, lawful assembly, and free speech; (3) to participate in any strike, walk-out or cessation of work or continuation thereof without the same being authorized by a majority vote of the employees to be governed thereby, provided that this shall not prohibit any person from terminating his employment on his own volition; (4) to enter into an all union agreement as a representative of employees in a collective bargaining unit, unless and until the employees to be governed thereby have by a majority vote authorized such agreement; (5) to conduct any election without a secret ballot; (6) to charge, receive, or retain dues, assessments or other charges, in excess of or not authorized by the constitution and by-laws; (7) to act as a business agent without a valid license; (8) to solicit membership or act as a representative of a labor organization without authority of such organization; (10) to act as business agent or representative of any labor organization which does not have on file with the Secretary of State its constitution and by-laws; (11) to seize or occupy property unlawfully during the existence of a labor dispute; (12) to refuse to handle, install, use, or work on particular materials or equipment and supplies because not produced, processed, or delivered by members of a labor organization; (13) to cause any cessation of work or interfere with the progress of work by reason of any jurisdictional dispute, grievance or disagreement between or within labor organizations; (15) to picket beyond the area of the industry within which a labor dispute arises; (16) to picket other than in a peaceable manner.

Section 9 authorizes the Attorney General or the County Attorney of any county of the state to prosecute an action for the suspension or revocation of any license of a business agent for violations of any provisions of the Act upon the complaint of any interested party, and provides that the action shall be commenced in the district court of the county of the residence of the business agent, or of the county in which the violations occurred, and that such actions shall be heard by the court without a jury in accordance with the Code of Civil Procedure. The court is authorized to suspend or revoke such license as in its judgment is deemed best.

Section 10 authorizes a suit against any labor organization in its commonly used name, provides for process of service, and for the enforcement of a judgment against the common property of such labor organization.

Section 12 provides that "except as specifically provided in this act, nothing therein shall be construed so as to interfere with or impede or diminish in any way the right to strike or the right of individuals to work; or shall anything in this Act be so construed to invade unlawfully the right to freedom of speech." Under Section 13 a violation of any provision of the Act is made a misdemeanor and is punishable by a fine not to exceed $500, or imprisonment in the county jail for six months, or both.

The Act also contains a severability clause to the effect that if any provision of the Act or the application thereof to any person or circumstance be held invalid, such invalidity shall not affect other provisions or application of the Act which can be given effect without the invalid provision or application, and to this end the provisions of the Act are declared to be severable in its operation. Cf. Section 111.18 of the Wisconsin Employment Peace Act, laws of 1939, c. 57, Wisconsin Statutes, before the Supreme Court in Allen-Bradley Local No. 1111 v. Wisconsin Employment Relations Board, 315 U.S. 740, 741, 62 S.Ct. 820, 86 L.Ed. 1154.

The Act, when considered in its entirety, is a comprehensive plan for the effective regulation of all labor organizations, their agents, and representatives operating, or desiring to operate, in the State of Kansas. It also attempts to regulate the conduct of individuals while engaging in concerted activities in furtherance of the aims and objects of the labor organization. However, such regulations are not intended to interfere with the right of employees to self-organization, to form, join or assist labor organizations, to bargain collectively

and to engage in concerted activities for that purpose, or other mutual aid or protection. See Sections 2 and 7. Nor is the Act to be construed to invade unlawfully the right of free speech. See Section 12.

On this record it is established that the existence and operation of a labor union necessarily involve the integrated, correlated and concerted activities of everyone connected with the organization, from the individual member to the highest official; that the activities of the individual member as he goes about his daily work preaching the doctrine of unionism is the heart and soul of the organization, and without which it cannot exist. It is also established that the life and strength of a labor organization is dependent upon the free exercise of speech, press and assembly, by all those who further its objects, regardless of their status in relation to the organization. It is plain also that compliance with certain provisions of the Act (Sections 3, 4 and 5) is a condition precedent to the exercise of whatever rights are involved in the functioning of a labor organization, and it is of course fundamental and self-evident that free speech, press and assembly are sacred human liberties, and their free exercise cannot be made to depend upon any condition imposed by state law, nor may they be previously restrained in the absence of clear and present danger to the community. On this premise it is argued by the complainants that since free speech, press and assembly are essential to the attainment of the common objects of the organization, and since compliance with the Act is a condition precedent to their exercise, they come squarely within the ambit of the Federal Constitution which secures these rights against abridgment by regulation under color of state law.

The spark which gave life and courage to these contentions of the complainants is found in the words of Mr. Justice Brandeis in Senn v. Tile Layers Union, 301 U.S. 468, 57 S.Ct. 857, 862, 81 L.Ed. 1229, when he said that "members of the union might, without special statutory authorization by a state, make known the facts of a labor dispute, for freedom of speech is guaranteed by the Federal Constitution." That case involved picketing as one of the attributes of the collective bargaining process. Then came Thornhill v. Alabama, 310 U.S. 88, 106, 60 S.Ct. 736, 84 L.Ed. 1093, in which peaceful picketing was definitely established as a form of dissemination of information concerning the facts of a labor dispute, which must be regarded as within that area of free speech guaranteed by the First Amendment to the Constitution, and it held a state statute, having for its purpose the regulation of the right to picket in the area of a labor dispute in an industrial conflict invalid upon its face, with the observation "where regulations of the liberty of free discussion are concerned, there are special reasons for observing the rule that it is the statute, and not the accusation or the evidence under it, which prescribes the limits of permissible conduct and warns against transgression." Thornhill v. Alabama, supra, 310 U.S. at page 98, 60 S.Ct. at page 742, 84 L.Ed. 1093. Although the court recognized that the rights of employers and employees were subject to modification and qualification in the public interests, it said that any such qualification could be justified only in cases of grave and immediate danger to the community.

The Thornhill doctrine met its first test in the Meadowmoor case (Milk Wagon Drivers Union of Chicago, Local 753 v. Meadowmoor Dairies), 312 U.S. 287, 61 S.Ct. 552, 555, 85 L.Ed. 836, 132 A.L.R. 1200, in which the union complained that an injunction by the Illinois court deprived its members of their constitutional right of free speech by preventing all picketing of an employer's business, merely because various acts of violence had occurred on the picketing lines. The majority of the court, speaking through Mr. Justice Frankfurter, while recognizing peaceful picketing as a form of free speech, held that the right of free speech had not been unduly invaded by the injunction, because the acts of violence on the picket line had generated a "momentum of fear [which] would survive even though future picketing might be wholly peaceful." The majority did not view this pronouncement as a qualification of the Thornhill and Carlson cases, but a strong minority (Justices Black, Douglas and Reed), regarded the reasoning of the court as a "basic departure from the Thornhill case", and were at pains to point out what they regarded as the departure.

Next came the Swing case, (American Federation of Labor v. Swing), 312 U.S. 321, 61 S.Ct. 568, 570, 85 L.Ed. 855, where the beauticians union sought to force a non-union beauty shop operator to employ union labor. Swing, the owner of the shop, obtained an injunction against the union on the grounds that under the law of Illinois,

picketing by persons not in proximate relation to the employment was unlawful. The Supreme Court reversed in an opinion also by Mr. Justice Frankfurter, in which he observed that the case clearly presented a substantial claim of the right of free discussion which should be guarded with a jealous eye, and that such ban of free communication was inconsistent with the guaranty of free speech. He said that the scope of the Fourteenth Amendment was not confined to the notion of a particular state regarding the wise limits of an injunction in an industrial dispute, whether those limits be defined by statute or by the judicial organ of the state; that a state could not deny the right of free speech "by drawing a circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him." Mr. Justice Roberts and the Chief Justice dissented on the grounds that the means employed were justified by the circumstances of the case.

Then came Bakery and Pastries Drivers and Helpers Local 802 of International Brotherhood of Teamsters v. Wohl, 315 U.S. 769, 62 S.Ct. 816, 86 L.Ed. 1178, by Mr. Justice Jackson. In that case, members of a labor union who were drivers engaged in the distribution of baked goods peacefully picketed their former employer, and the employer's customers in an effort to induce peddlers, who had taken their places as independent contractors, to work six days a week and hire a non-union member one day a week at union wages. The New York State Court granted an injunction on the theory that a labor dispute did not exist within the meaning of the New York Anti-Injunction Act, and the picketing was therefore an unlawful labor objective. The Supreme Court reversed, holding that the state could not abridge the right of free speech on its conception of what constituted a labor dispute within the state law. For the first time, however, the court indicated an overt disposition to contract the doctrine of the Thornhill case by recognizing the right of the state to regulate peaceful picketing under circumstances which the court did not define or disclose. The minority recognized this aberration from the Thornhill case by a special concurring opinion, in which the purity of the right of freedom of speech as practiced through the medium of a picketing line was reaffirmed without qualification. The court said that

if the principles of the Thornhill case are to survive, the state must not be permitted to prescribe the limitations of the area of a labor dispute in the absence of clear and present danger to life and property.

The cleavage between the two schools of thought is made plain in Carpenters and Joiners Union of America, Local No. 213 v. Ritter's Cafe, 315 U.S. 722, 62 S.Ct. 807, 810, 86 L.Ed. 1143. Ritter owned a cafe in which he employed only union labor, and also owned a plot of land about one and one-half miles from the cafe, upon which he let a contract to construct a building to a contractor who employed non-union workmen on the project. The Carpenters Union peacefully picketed Ritter's cafe in an endeavor to induce Ritter to require the contractor to employ only union labor, and the restaurant employees were also induced to a sympathetic strike at the cafe. The Texas court found that the picketing activities constituted a violation of the state anti-trust law, and enjoined picketing of the cafe. The Supreme Court affirmed in an opinion by Mr. Justice Frankfurter, in which he said that although peaceful picketing was one phase of the "constitutional right of free utterance", it was also in reality one of the familiar weapons of industrial combat, and as such could be limited by the state within reasonable bounds.

That because the restaurant business has no "nexus" with the labor dispute, the Texas court could insulate an area which had no industrial connection with it. The court reasoned that although a labor dispute was the occasion for the exercise of freedom of expression, it was met with the claims on behalf of the state to impose reasonable regulations for the protection of the community as a whole. There was a dissent by Justices Black, Douglas and Murphy, and a separate dissent by Justice Reed, in which the "basic departure" from the doctrine of the Thornhill case was again emphasized. Thus in the opinion of a strong minority, the Thornhill case has been sapped of much of its original strength and vigor by process of judicial attrition.

It may be said that the Ritter case revitalized the philosophy of Justice Brandeis when he said, "All rights are derived from the purposes of the society in which they exist; above all rights rises duty to the community." Duplex Printing Press Co. v. Deering, 254 U.S. 443, 488, 41 S.Ct. 172, 184, 65 L.Ed. 349, 16 A.L.R. 196. The obvious limitations upon free speech sanc-

tioned in the Ritter case are found in the doctrine relating to the permissible area of an industrial conflict, rather than upon the test of "clear and present danger" heretofore thought to be the only permissible limitation upon the right of free speech. In other words, freedom of speech practiced through the medium of picketing is characterized as a form of coercive technique which is entitled to constitutional protection, but not without special limitations in the public interest. To that extent the "clear and present danger" test as applied to peaceful picketing in the Thornhill case gave way to the "reasonable basis" test in the Ritter case. See Norris LaGuardia Act in the Constitution, George Washington Law Review, June 1943, page 441; Picketing and Free Speech; A Dissent, Harvard Law Review, January 1943; Picketing and Free Speech; A Reply, Harvard Law Review, January, 1943; Freedom of Speech and Labor Controversies, Missouri Law Review, January, 1943.

Since picketing is only one of the familiar weapons used by unions in the attainment of their economic objectives, we think the philosophy of the cases which have defined the quality of free speech inherent in picketing furnishes a reliable criterion for the determination of the quality of the rights involved in the whole of the economic struggle in the field of industrial relations.

The Constitutionality of Section 5 of the Texas Labor Act, House Bill No. 100, Acts of 1943, c. 104, p. 180, Vernon's Ann.Civ. St. art. 5154a, § 5, which is textually and contextually similar to section 3 of the Kansas Act, was challenged in Ex parte Thomas, 141 Tex. 591, 174 S.W.2d 958, 960. Thomas a union official, after having been previously restrained from speaking to a publicized meeting sponsored by a local labor union, delivered a prepared address at the scheduled meeting in which he espoused the cause of unionism, urged everyone present to become a member of the local union and offered if necessary to personally issue the membership cards. Specifically, and as if deliberately to test the requirements of the Act, he singled out one O'Sullivan and solicited his membership in the union. After the speech had been delivered to a peaceful assembly, he was arrested and charged with contempt for violations of the injunction restraining the solicitation of members in the labor union without first having obtained an organiz-er's card as required by Section 5 of the Texas Act. He was found guilty and sentenced for contempt. On habeas corpus to the Supreme Court of Texas, Thomas contended that Section 5 of the Act was unconstitutional as an abridgment of free speech and assembly, but the Texas court held that because "labor unions enter into practically every business and industrial enterprise, and greatly affect the economic condition of the country", the restraints imposed upon free speech and assembly by the Act, as enforced, was justified in the public interest. In arriving at these conclusions, the Texas Court used the "reasonable basis" rather than the "present clear danger" test as a guide for constitutional justification.

The Supreme Court of the United States, 323 U.S. 516, 65 S.Ct. 315, discharged Thomas, holding that the injunctive process of the Texas court deprived him of his constitutional right to traditional free speech. The court observed that the state had made no distinction between the general and personal solicitations of membership, and that the injunction must therefore be regarded as prohibiting all. On this basis, the court held that because the threat of the restraining order, backed by the power of contempt, and the arrest for crime hung over every word of his speech delivered to a peaceful assembly, he was previously restrained from exercising his constitutional right to free speech.

The conclusions of the court are planted squarely upon the fundamental premise that the state may not either by statute or injunctive process, restrain any person from publicly speaking in behalf of unionism at a peaceful assembly, although the speech may have for its purpose the direct solicitation of members in the organization for which he speaks. But the court did not nullify the Texas Act or any section thereof, rather it freely conceded the power of the state to regulate labor unions in the public interest so long as such regulations did not trespass upon the domain set apart for the exercise of traditional free speech and assembly. A strong minority thought that the restraints were reasonable and justified, and although the court specifically refrained from so holding, we think it may be fairly implied from what was said in the majority and concurring opinions that the state may, without infringing the constitutional safeguards, condition the right of an individual to personally solicit member-

ship in a union when that solicitation partakes of a commercial transaction in the field of union activities. In sum, the advocacy of the cause of labor unions was placed on a constitutional parity with any other cause or doctrine, and so long as such advocacy is not primarily devoted to a commercial objective, it is not subject to restrictive legislation unless the public interest clearly outweighs the value of the right to the individual. But the court did not attempt to draw the line between the purely doctrinal aspects of the union enterprise which is free from restraint and the purely commercial which, like all other enterprises, is subject to reasonable regulation—beyond the observation that the task was a "difficult" one. The decision in that case rested upon the concrete clash of actualities. The court was not required to draw hypothetical lines—it deliberately refused to do so, and we must do likewise.

The states of Alabama (Acts of 1943, p 252, Code 1940, Title 26, § 376 et seq.) and Florida (Acts 1943, Chap. 21968, F.S.A., Sec. 481.01 et seq.) have enactments similar to Texas and Kansas. The Supreme Court of Alabama (Alabama State Federation of Labor v. McAdory, 18 So.2d 810) has sustained the constitutionality of the Act of that State when considered as a whole, and in particular it has sustained that provision (Sec. 7, Code Ala. 1940, Tit. 26, § 382, similar to Sections 4, 5 and 6 of the Kansas Act), which is designed to regulate the functions of labor organizations in the state, on the grounds that a reasonable basis exists for the exercise of the state police power within the limits of free speech, press and assembly. The court nullified as fundamentally unconstitutional sections 12 and 13, and the cognate parts of Section 14, Code Ala.1940, Tit. 26, §§ 387–389, which are similar to Section 8 (3) (12) and (13) of the Kansas Act. See also A. F. of L. v. Bain, 165 Or. 183, 106 P.2d 544, 130 A.L.R. 1278, but see Borden v. Sparks, D. C., 54 F.Supp. 300. The Florida Supreme Court (Hill v. State, 19 So.2d 857) has sustained Sections 4 and 6 of its act, F.S.A. §§ 481.04, 481.06, which are not materially different from Sections 3, 4 and 5 of the Kansas Act, as against the contention that compliance with these sections

of the Act constitutes a violation of the constitutional right to free speech and assembly. Cf. the Colorado Peace Act in A. F. of L. v. Reilly, 1944, 155 P.2d 145. On November 20, 1944, and February 5, 1945, the Supreme Court of the United States granted certiorari to review both the Alabama and Florida cases, (65 S.Ct. 191 and 588) and it cannot escape the necessity of deciding the very questions presently before us.

■ We have the word of the Attorney General of the State of Kansas, speaking in his official capacity, that he does not regard the activities of "stewards" and non-salaried union men in the solicitation of members, and the collection of dues, as within the ambit of the definition of a "business agent" under § 1, subd. 2 of the Act, and that they are therefore not subject to the licensing requirements of Section 3. The Attorney General in his official capacity freely recognizes the right of any individual to speak for and on behalf of a labor organization, and for members of the union to publicly solicit memberships and to peaceably assemble in the furtherance of the right of self-organization without any previous restraint, and without violation of any of the provisions of this Act. We think it is our duty to take the word of the highest enforcement officer of the state concerning the construction of an act which we are called upon to annul as unconstitutional, and if we take his word, it follows that only salaried representatives of a labor organization who engage in union activities as a livelihood or vocation are required to comply with Section 3 of the Act.[1]

■ Sections 4, 5, 6 and 10 regulate labor organizations as legal entities and artificial bodies, "Structurally and functionally, a labor union is an institution which involves more than the private or personal interests of its members. It represents organized, institutional activity as contrasted with wholly individual activity", and individuals while "acting as representatives of a collective group, cannot be said to be exercising their personal rights and duties and to be entitled to their purely personal privileges. Rather they assume the rights, duties and privileges of the artificial entity or association of which they are agents or officers and they are bound by its obliga-

---

[1] In the course of the argument on the definition of "business agent" under Section 1, subd. 2, the Attorney General stated that "it would be absurd to say that the Kansas Legislature intended to inhibit the right of anyone to invite another to join his organization, and that extends to pre-organizing also".

tions." United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 1252, 88 L.Ed. 1542.

As we have said, the process of self-organization, collective bargaining and all other allied union activities necessarily involve the rights of free speech, press and assembly which may not be conditioned by statute or previous restraint by injunctive process, but we must also recognize that the sum and total of all union activities are directed toward economic objectives and necessarily involve purely commercial activities which may be regulated in the public interest on any reasonable basis. In short, when used as an economic weapon in the field of industrial relations or as coercive technique, speech, press and assembly are subject to reasonable regulation in the public interest and in that respect the state is the primary judge of the need, and it is not required to wait until the danger to the community which it seeks to avoid is "clear and present".

We are not in accord with the Alabama, Florida and Oregon courts [2] in the treatment of their respective enactments, and we think we may assume for the purposes of this case that the Supreme Court of Kansas would follow the Alabama court in the condemnation of those similar sections of the Act which make unlawful any strike, walkout, or cessation of work, unless authorized by a majority of the employees, or to refuse to handle, install, use or work on particular materials, equipment or supplies because not produced, processed or delivered by members of a labor organization, or to cause any cessation of work or interference with the progress of work by reason of any jurisdictional dispute or disagreement between or within labor organizations. Cf. A. F. of L. v. Bain, supra. The Attorney General has expressly refrained from stating what his "decisions are going to be finally" in regard to the various sub-sections of Section 8. But, no party to this suit or anyone similarly situated has actually been charged with violations of any of these provisions, and our question then is, does the "pervasive threat inherent" in the very existence of these penal provisions generate such a "momentum of fear" as to actually constitute a previous restraint upon human liberties?

Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093; Hague v. C. I. O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423. If it does, we think that injunctive relief is an appropriate exercise of the jurisdiction committed to this court.

The right to peaceably strike or to participate in one, to work or refuse to work, and to choose the terms and conditions under which one will work, like the right to make a speech, are fundamental human liberties which the state may not condition or abridge in the absence of grave and immediate danger to the community. But by Section 8(3) (12) (13), the State of Kansas has not only conditioned these rights, but expressly prohibited them and made their exercise a criminal offense. In this setting we think it is the inherent prohibitions of the statute standing alone which impose the unconstitutional restraint, and those against whom the statute is plainly directed should not be required to abide the processes of criminal justice in order to obtain the redress to which they are entitled under the Federal Constitution.

We are also urged to nullify the Act in its entirety because the conditions it imposes curtail the right of the employee to the advantage of the employer, thereby depriving the complainants of the equal protection of the laws under the Constitution. But that argument was fully answered by the Supreme Court in National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, when the employer made the same argument in regard to the provisions of the National Labor Relations Act. The employer complained that the National Labor Relations Act singled out the employer for regulations while encouraging and assisting the employee. The philosophy in that case is sufficient answer to the contentions here.

The further contention that the Act in question is a burden upon interstate commerce and cannot stand in the field of labor relations with the National Labor Relations Act is answered by the pronouncements in Allen-Bradley Local No. 1111 v. Wisconsin Employment Relations Board, 315 U.S. 741, 62 S.Ct. 820, 86 L.Ed. 1154, supra. We deem it unnecessary to

---

[2] Alabama State Federation of Labor v. McAdory, Ala., 18 So. 810; Hill v. State, Fla., 19 So.2d 857; A. F. of L. v. Bain, 165 Or. 183, 106 P.2d 544, 130 A.L.R. 1278.

62

say more than that the two acts are not in conflict upon their face and it will be time enough to judge the operative conflicts when they actually arise.

█ We conclude that sub-sections (3) (12) and (13) of Section 8 of the Act are unconstitutional and void on their face, and the defendants are enjoined from enforcing or giving effect thereto. But, under the broad severability clause, the invalidity of one section or provision of the Act does not affect the validity of the other provisions, unless they must stand or fall together. We are of the opinion that the remaining provisions of the Act as construed for the purposes of our case, are not plainly unconstitutional and we are therefore not warranted in overriding the declared public policy of the state of Kansas by the exercise of our injunctive jurisdiction.

█ Because we have refrained from enjoining certain sections of the Act, we do not wish to be understood as necessarily adjudicating their constitutionality as they may be ultimately construed and applied. Because it is our inescapable duty to examine the complaint of the deprivations of personal rights under the color of state statute does not mean that we are also required to divine all of the possible encroachments which may result from the enforcement of the Act. We simply hold that they do not upon their face encroach upon fundamental human rights.

Conventional findings of fact and conclusions of law consistent with the views herein expressed will follow.

HUXMAN, Circuit Judge (dissenting).

I agree with the majority that Sections 8(3) (12) (13) are unconstitutional and that enforcement thereof should be enjoined. I also agree that many of the other provisions of the Act do not present a justiciable controversy at this time and that we should therefore refrain from passing upon them, notwithstanding that all the parties would like to have us do so. I proceed upon the assumption that it is agreed that Section 3, which requires a license of a business agent—whatever the definition of a business agent may be—places a burden upon the exercise of the right of free assembly and of free speech, and that Section 4, which requires the filing of the Constitution and by-laws, and Section 8(7) (8), which make it a criminal offense for one to act as business agent without a license or

to act as business agent for a labor organization whose constitution and by-laws are not on file likewise impose burdens upon the exercise of these same rights. These sections either do or do not burden the right of speech and of peaceable assembly, and if they do, it is our duty to pass upon the reasonableness thereof. If compliance with these sections is not required before one may exercise the right of free speech and of peaceable assembly, we should so state in clear language, and make it the basis for our refusal to issue the injunction. There is language in the majority opinion from which an inference might be drawn that an interpretation of the term "business agent" and of what activities fall within the scope of his employment might be necessary before we could determine whether these sections impinge upon these constitutional rights. I discard that possibility as a basis for the decision of the majority, because in that event we should stay our hand and require the parties to obtain that interpretation in the state courts before we decide whether these provisions violate the constitutional rights of free speech and of free assembly. While the opinion of the majority does not state that these provisions do or do not constitute an unwarranted interference with the right of free speech and peaceable assembly with the same degree of definiteness of language that is used in passing upon the constitutionality of Section 8(3) (12) (13), I conclude that the refusal of the majority to enjoin interference with the right of free speech without complying with these sections means that the majority holds that these provisions do not violate these constitutional guarantees. This is the basis of my dissent.

It is without doubt true that the protection of the rights of individuals, as well as the general welfare of the community as a whole, justifies the imposition of many burdens and restraints upon one in the exercise of his constitutional rights of free speech or of peaceable assembly. These rights are not absolute. In organized society there is no such thing as absolute freedom of action, whether by means of free speech, free assembly, or in any other way. Organized society is made possible only by the relinquishment of individual rights. The more complex society becomes, the more regulation of our conduct toward each other becomes necessary. All of this is accomplished through constitu-

tional legislative enactments under the great reservoir of implied power generally spoken of as the police power of a state. Emergencies or new complexities do not create power to legislate. They merely occasion the right to use the existing power. In the absence of such new situations, the exercise of the power would be unreasonable and unwarranted.

No one can intelligently challenge the right of government to regulate labor unions. It may regulate chambers of commerce, church organizations, or any of the innumerable associations formed for the mutual benefit of the members, when such activities come into conflict with public interest or the reasonable rights of others. So the State may, by appropriate regulation, protect laborers eligible to membership in unions against exploitation by unscrupulous agents, against exaction of unreasonable dues, or against fraud, or in many other ways, the same as it may protect the public against quacks of all kinds or as it may protect one business man against unfair trade practices by his competitor.

Freedom of worship is one of the most sacred of our constitutional guarantees and is most zealously guarded by the courts. But that does not mean that a church society may hold a revival on a summer night in a populous residential district and sing hallelujahs and shout hosannas until 2:00 o'clock in the morning. Neither does it warrant a congregation in blocking the public streets or the private driveways in the vicinity of the church and in denying to the public or to the individual residents ingress or egress thereto. What I am trying to say is that all individual rights are relative, and subject to reasonable regulation in the interest of the community as a whole. No one would contend that a regulation prohibiting the holding of a revival in a thickly populated residential section at 2 o'clock in the morning was unconstitutional because it challenged the right of free speech or free assembly. Neither would anyone contend that such a regulation of a revival in a rural area, five miles from any residence, was constitutional. It is not enough that there is power to regulate or even need for regulation, but the regulation in every instance must be reasonable and must reasonably tend to accomplish a permissible attainment.

The Alabama Supreme Court, in the case referred to in the majority opinion, as well as the majority in this case, stress the well-recognized principle of law that there is a presumption of constitutionality and that courts are loath to substitute their judgment for that of the Legislature, and that they will not strike down legislation unless it can clearly be said that there is no constitutional authority for the same. With this wholesome principle I am in full accord.

But is has no application when sacred constitutional guaranteed rights are involved. Then an entirely different principle must guide us. That is the conclusion I draw from the decision of the Supreme Court in the Thomas case. The court points out that these constitutional guarantees have a sanctity and solemnity which it not accorded to general rights arising by operation of statutory law. When a regulation impinges one of these rights, it must not only be justified by a clear public interest and be passed to meet a clear and present danger to such right, but it must also be reasonable and must have a reasonable relation to the object sought to be accomplished. In such case, there is no presumption of constitutionality. There is rather a suspicion in the minds of the courts, the guardian of our constitutional liberties, and the burden is upon him who would uphold the interference with such rights to carry the burden of justifying the interference within the test laid down by the Supreme Court in the Thomas case. As stated by the Supreme Court, when the right to restrict the exercise of free speech is the subject of inquiry, it is our "tradition to allow the widest room for discussion, the narrowest range for its restriction." [323 U.S. 516, 65 S.Ct. 315, 323.]

Our inquiry then is to ascertain the reasonableness of the restraints placed upon the constitutional rights of free speech and free assembly by these provisions of the act within the definitions as laid down. There can be no imminent danger to the public or to the rights of others in the mere exercise of the rights of peaceable assembly or of free speech. Peaceable assembly negatives danger to the rights of others. Neither can danger be implied from the mere exercise of the right of free speech. The danger to the public or to others comes, if at all, from the time, the manner, or the way in which these rights are exercised. The State has a right to regulate the time, the manner, the place, the means, and the conditions under which these

rights are exercised. It may not burden the right itself. The State may not require anything as a condition precedent to the exercise of the right to strike. It may, by appropriate legislation, regulate the manner in which a strike is carried on. The distinction is between the right to speak and the way in which the right is exercised. The one is subject to regulation—the other is not. It is, of course, obvious that the one shades into the other. In a way, regulating the time and the manner in which a speech is delivered is a regulation of the right to speak. There is, however, a valid distinction. The fact that the two are so interrelated accentuates the necessity of inquiry to make sure that any burden placed upon the right to speak is passed for the purpose of accomplishing permissible regulation of the manner in which that right is exercised, and that it reasonably tends to accomplish that purpose.

What abuses does the act seek to regulate, what public interest is sought to be promoted, what pernicious labor activities are sought to be controlled or prohibited by the sections of the Act that burden the right of free speech or of free assembly? The answer is, none. How do the requirements for a license or the prohibition to act as a labor representative when the constitution and by-laws are not on file tend to protect the public against any unfair labor practices in addition to the protection that is afforded by the penal sections of the Act? The requirement of a license, the filing of the constitution and by-laws, in no way relate, directly or remotely, to the provisions regarding strikes, picketing, unlawful seizure or occupancy of other's property during a labor controversy. Doing any of these things does not affect the right to a license or the right to speak or peaceably assemble. The remedial provisions of the act are as effective without the provision of a license or the filing of the constitution and by-laws as with them. Under these circumstances, conditioning the right to speak upon the procurement of a license or upon the filing of the constitution and by-laws is an unwarranted and unreasonable burden upon the right of free speech and of peaceable assembly. It is not necessary to decide whether the State may, by appropriate legislation, require an association to file its constitution and by-laws, or whether it may require a license of a business agent of an association before he may operate in the state. For the purpose of

this dissent this right may be conceded. It is sufficient to say that it may not, in the manner in which it has in this Act, thus condition the right to speak or to peaceably assemble.

The majority attempt to make a distinction between a person acting in a purely individual capacity and as a representative of a collective group or association. It is stated that one acting as the representative of an association is not exercising his personal rights. That such distinction exists in many instances is of course obvious. A good illustration is apparent from the facts upon which rest the decision in United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542. But if by that is meant or implied that the right to speak, when exercised in behalf of an organization which the speaker represents, may be burdened otherwise than when he speaks for himself, I cannot agree. Thomas was a paid organizer and represented his union and was speaking as such and in behalf of the union when he made the speech in which the injunction was issued and which the Supreme Court struck down.

If the State may say to a labor organizer that he may not address a meeting called in the interest of his union and being conducted in a proper manner, because he has no license or because the constitution and by-laws of the organization are not on file, it may likewise say to a minister of the Gospel that he may not speak to a church meeting if he does not have a license or if the constitution and by-laws of the church are not on file. Freedom of speech is no more sacred and is just as subject to proper regulation when exercised in behalf of religion as for any other lawful purpose.

The provisions of the statute prohibiting the doing of certain things and regulating the doing of others are just as effective without the provisions requiring the license or the filing of the constitution and by-laws as with them, and the burden which they impose upon the constitutional right of free speech and of free assembly is therefore unreasonable and unwarranted.

We cannot shrug these burdens off by saying that the means to be employed was for the consideration of the Legislature and we will not substitute our judgment or interfere with its exercise of discretion. These matters burden constitutional rights. The State may not do this unless it clearly shows the danger to be prevented and the reasonableness of the measures employed.

The State has failed to show that there is imminent grave danger to the public which requires the imposition of these burdens. Furthermore, the State has wholly and completely failed to show that these burdens, as they are set out in the statute, have any reasonable or substantial relation to any remedial object sought to be obtained by the remedial provisions of the statute.

I would enjoin the enforcement of all the provisions of the statute that are made a condition precedent to the right to speak or peaceably assemble.